STATE of Wisconsin, Plaintiff-Respondent,

v.

Jeffry D. PATERSON, Defendant-Appellant.†

Court of Appeals

*No. 97–2066–CR. Submitted on briefs April 24, 1998.—Decided June 10, 1998.*

(Also reported in 583 N.W.2d 190.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *John O. Olson*, of *Braden & Olson* of Lake Geneva.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Leonard E. Martin*, assistant attorney general.

Before Brown, Nettesheim and Anderson, JJ.

NETTESHEIM, J.   Jeffry D. Paterson appeals from judgments of conviction entered after he pled guilty to manufacturing tetrahydrocannabinols (THC) and possession of improvised explosives. Paterson contends that the trial court erroneously denied his motion to suppress evidence discovered by officers after a war-

rantless entry into his home. The circuit court held that the officers' actions were justified as community caretaker activity. We conclude that the officers' entry into Paterson's home was not justified under the community caretaker exception to the search warrant requirement. We therefore reverse the judgments and remand for further proceedings.

## FACTS

On November 4, 1996, at approximately 5:25 p.m., Michael Mehring, the Chief of Police in the Town of Burlington in Racine County, and two other officers were dispatched to Paterson's residence at 6630 Yahnke Road.

The dispatcher informed the officers that the department had received a call from a neighbor who lived approximately seventy-five to eighty yards from Paterson's home. The neighbor called to report suspicious activity at the residence and a possible burglary in progress. Mehring testified that the neighbor reported "that there was lights going on and off in the upper level of the residence characteristic with somebody moving about from room to room within the upper level of that residence turning on lights momentarily, turning them off and proceeding to another room . . . ." The dispatcher additionally informed the officers that the neighbor had called over to the Paterson home and had received no response. The neighbor also reported that the garage doors were open.

When Mehring arrived at the home he observed that the overhead garage door was "standing fully open." There was a pickup truck parked in the garage. There were lights on in the lower level of the home and one light on in the upper level. Mehring remained near the garage of the home while another officer walked

around the residence to see if there was any activity within the home. According to Mehring, there were no signs of forced entry into the residence. The officers requested the sheriff's department to telephone the residence in order to make contact with any occupants of the home. After learning that the attempt was unsuccessful, Mehring entered a foyer area attached to the garage which led to the basement portion of the residence.

Mehring testified that the door allowing access to the basement of the residence was closed but unlocked. The officers opened the door and announced their arrival. After receiving no response, the officers stepped inside and announced themselves again. Still receiving no response, the officers proceeded to enter the residence to "see if there was something amiss." Mehring testified that they then systematically checked each room. In the fourth room they entered, Mehring noticed marijuana plants hanging from floor joists. Mehring instructed the officers to secure the area and notified the Racine County Metro Drug Unit. The officers did not proceed with a further search of the residence at that time.

While waiting for members of the drug unit to arrive, Mehring heard footsteps coming from the upper level of the home. Mehring went to the stairs and announced his presence. After announcing a second time, a young girl appeared at the top of the stairs. She informed the officers that neither her mother nor her mother's boyfriend was home. After approximately fifteen minutes, the girl's mother, Angela Pischke, entered the lower level through the foyer door. Officer Patrick Ketterhagen of the Metro Drug Unit arrived shortly thereafter.

Ketterhagen testified that he examined and tested the plants for the presence of THC. Pischke refused to consent to a search of the residence so Ketterhagen used the results of the plant test as the basis for obtaining a search warrant. Pischke informed Ketterhagen that the residence was owned by Paterson who was hunting nearby. Eventually, the search warrant was issued and the Metro Drug Unit conducted a search of the residence at 11:55 p.m. Based on this search, two additional search warrants were issued and searches of Paterson's residence were conducted on November 5 and 6.

On November 7, 1996, Paterson was charged as a party to the crime of manufacturing THC, tax stamp violations, possession with intent to deliver THC and possession of an electric weapon.

On December 19, 1996, the State filed a seventeen-count information. In addition to the original charges, Paterson was charged with possession of a short-barreled shotgun and eleven counts of possessing an improvised explosive device.

On January 9, 1997, Paterson filed a motion to suppress evidence. Paterson argued that "all searches of [his] residence on November 4, 5, and 6, 1996, with or without a search warrant were prohibited because each was based directly upon or were the fruit of an initial unlawful search of the defendant's residence." The court held a hearing on the motion on March 27, 1997. The court denied the motion finding that the officers' entry into the house was justified as community caretaker activity.

On April 15, 1997, Paterson pled guilty to one count of manufacturing THC (party to the crime) contrary to §§ 961.41(1)(h)2 and 939.05, STATS.; and to three counts of possessing an improvised explosive

device contrary to § 941.31(2)(b), STATS. The remaining charges were dismissed. However, eight counts of possessing improvised explosives were read in for purposes of sentencing, as was the charge of possessing an electric weapon.

Paterson was sentenced to two years in prison on the charge of manufacturing THC, one consecutive year in prison on the possession of an improvised explosive device and one year consecutive for the second charge of possessing an improvised explosive device. Finally, the trial court imposed three years' probation, concurrent to the prison sentence, for the remaining explosives charge. Paterson now appeals.

## DISCUSSION

When reviewing a trial court's denial of a motion to suppress, this court "will uphold a trial court's findings of fact unless they are against the great weight and clear preponderance of the evidence." *State v. Richardson*, 156 Wis. 2d 128, 137, 456 N.W.2d 830, 833 (1990). However, whether a search or seizure passes statutory and constitutional muster presents a question of law which we review de novo. *See id.* at 137–38, 456 N.W.2d at 833.

Both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution prohibit unreasonable searches and seizures. The warrantless search of a house is presumptively unreasonable. *See Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984). However, "our laws recognize that, under special circumstances, it would be unrealistic and contrary to public policy to bar law enforcement officials at the doorstep." *State v. Smith*, 131 Wis. 2d

220, 228, 388 N.W.2d 601, 605 (1986). Therefore, a handful of exceptions have been "jealously and carefully drawn" to balance the interests of the individual with those of the State. *See State v. Monosso*, 103 Wis. 2d 368, 372, 308 N.W.2d 891, 893 (Ct. App. 1981) (quoted source omitted).

The State argues that the officers' warrantless entry into Paterson's home was justified under the community caretaking exception. This exception was first recognized by our supreme court in *Bies v. State*, 76 Wis. 2d 457, 251 N.W.2d 461 (1977). There, the court stated that "the 'community caretaker' function of the police which, while perhaps lacking in some respects the urgency of criminal investigation, is nevertheless an important and essential part of the police role." *Id.* at 471, 251 N.W.2d at 468.

The standard for evaluating whether police action was justified as "community caretaker" activity was set forth in *State v. Anderson*, 142 Wis. 2d 162, 169, 417 N.W.2d 411, 414 (Ct. App. 1987), *rev'd on other grounds*, 155 Wis. 2d 77, 454 N.W.2d 763 (1990). There we concluded that the court must inquire as to whether, at the time of the conduct in question, the officer was engaged in "bona fide community caretaker activity." *See id.* The court must also weigh the public good arising from such activity against the intrusion into individual privacy. *See id.* The court must determine whether the ultimate standard under the Fourth Amendment of "reasonableness" has been met in light of the facts and circumstances of the case. *See id.* at 168, 169–70, 417 N.W.2d at 413, 414. To assist in this inquiry, *Anderson* set out four relevant considerations: (1) the degree of the public interest and the exigency of

the situation; (2) the attendant circumstances surrounding the search, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability and effectiveness of alternatives to the type of intrusion actually accomplished. *See id.* at 169–70, 417 N.W.2d at 414.

We now consider the facts of this case under the *Anderson* factors.[1] We will discuss two of the factors—the attendant circumstances surrounding the search, and the degree of public interest and the exigency of the situation—in a single discussion. First, we consider the information provided by the neighbor who reported the incident. The neighbor reported that lights were going on and off in the upstairs portion of the residence, consistent with someone moving from room to room. Although perhaps unusual, this activity alone does not suggest criminal activity nor the need

---

[1] Paterson submits that the officers were not engaged in bona fide community caretaker activity because they were investigating possible criminal activity at the time. He relies on language from certain community caretaker cases stating that community caretaker activity "is totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute." *State v. Ellenbecker,* 159 Wis. 2d 91, 96, 464 N.W.2d 427, 429 (Ct. App. 1990). The State posits, however, that in certain situations, the police activity cannot be so easily catalogued and that sometimes there is a blend of both the community caretaker function and the criminal investigation function. Although we could discuss the language found in *Ellenbecker* and other cases at length, it is unnecessary here. We assume without deciding that the police were legitimately engaged in a community caretaker function and decide instead whether the entry and search were reasonable under the community caretaker function.

for police intrusion to protect the occupant's property. A more reasonable deduction is that a person legitimately on the premises was simply moving from room to room. The same is true of the unanswered telephone call reported by the neighbor. A person legitimately in the residence may be preoccupied or otherwise simply choose to not answer a call. Or, if a child is home alone, the child may have been instructed to not answer the telephone. In short, the information provided by the neighbor did not present an overly worrisome situation.

In addition, the time of day regarding the incident did not aggravate the situation. The neighbor reported the matter at approximately 5:30 p.m. Although it was dark, this was not a time of the day when a residential burglary would normally occur.

Next, we consider the other facts observed by the police upon their arrival and prior to their entry into the residence. Mehring observed a truck parked in an open garage. He could not recall whether the vehicle's registration had been checked to ascertain its ownership.[2] In addition, Mehring gained access to the residential portion of the dwelling through a closed but unlocked door. We see nothing in these additional facts which reasonably suggested criminal activity or the need for police intrusion into the residence to protect the property. Even with greater public awareness about crime in these times, we do not deem it remarkable that a person would leave a garage door open or a residential door unlocked.

We conclude that the attendant circumstances surrounding the search and the degree of public inter-

---

[2] If the police had checked the registration, they would have learned that the vehicle was registered to Paterson, the owner of the residence.

est and the exigency of the situation did not permit the police to enter the residence.

*Anderson* also requires that we consider the availability, feasibility and effectiveness of alternatives to the intrusion. *See id.* at 170, 417 N.W.2d at 414. Here the police had other effective options short of entry into the residence. They could have monitored the residence and waited out the situation. Or, they could have made attempts to locate the owner or occupants in an effort to determine whether something was truly amiss or to obtain consent to enter. Instead, they entered through a closed door leading to the basement of the home. Although the officers announced their presence at the threshold, they did so only after opening the closed door and without making any attempt to first gain a response by knocking.

Finally, *Anderson* requires that we consider whether an automobile is involved in the community caretaker situation. *See id.* at 169, 417 N.W.2d at 414. This is because "[i]n some situations a citizen has a lesser expectation of privacy in an automobile." *Id.* at 169 n.4, 417 N.W.2d at 414. Here, however, we deal with a person's residence which invokes the highest level of privacy expectation.

After considering all of the relevant *Anderson* factors, we conclude that the officers' entry into the Paterson residence was in violation of the Fourth Amendment.

The supreme court's analysis in *Bies* supports our holding. There, the officer responded to a noise complaint in an alley in a garage. *See Bies*, 76 Wis. 2d at 461, 251 N.W.2d at 463. However, when the officer arrived, he did not hear any noise. *See id.* at 462, 251 N.W.2d at 464. As the officer approached the garage, the light inside the garage went out. *See id.* at 461, 251

N.W.2d at 463. The officer attempted to look into the windows on the overhead doors but was unable to see anything. He then proceeded to a window but was still unable to see into the garage. Finally, the officer proceeded to the rear of the garage where he found a "walk-in doorway, not visible from the alley, from which the door was missing." *See id.* When the officer shined his light into the garage he discovered stolen telephone cable. *See id.*

In *Bies*, it was undisputed that the officer did not have probable cause to believe that a crime was being committed by the defendant or anyone else when he arrived at the garage. *See id.* at 465, 251 N.W.2d at 465. Nonetheless, the *Bies* court concluded that as part of the officer's "community caretaker" function, he was "clearly justified in proceeding to the alley in question and conducting a general surveillance of the area to determine whether some noise or other disturbance was present." *Id.* at 471, 251 N.W.2d at 468. The court further concluded that the officer's approach to the walk-in door was a reasonable attempt to make contact with someone regarding the noise complaint. *See id.* at 472, 251 N.W.2d at 468. However, the court stated: "Had the walk-in door been shut, he would not have been justified in opening it without an invitation . . . ." *Id.*

Here, as in *Bies*, there is no claim that the officers had probable cause to enter the Paterson residence. The only information within the knowledge of the officers at the time of their entry was the neighbor's report of a possible burglary and the other attendant circumstances observed by the police. However, when the police arrived at the scene, the unusual activity had stopped and no further suspicious activity was observed. Nor did any of the attendant circumstances

corroborate and contribute to the suspicion reported by the neighbor. Although the neighbor's report was presumably well intended, it did not give the police unbridled license to enter the residence under these facts. Nevertheless, the officers entered Paterson's household through a closed door without first trying to make contact with an occupant by knocking. We take particular note that the entry in this case was directly into Paterson's actual residence, not a separate garage structure as in *Bies*.

In light of the circumstances presented, we hold that the officers' entry into the Paterson home was not justified as community caretaker activity and, as such, was unreasonable under the Fourth Amendment.

We conclude that the trial court erroneously denied Paterson's motion to suppress the challenged evidence. We therefore reverse the judgments of conviction and remand for further proceedings consistent with this opinion.[3]

*By the Court.*—Judgments reversed and cause remanded.

---

[3] In light of our holding that the police search of Paterson's residence was unreasonable, we need not address the State's further contention that the evidence was properly seized under the plain view doctrine. That doctrine requires, among other things, that the police must have a prior justification for being in the position from which the evidence is discovered in plain view. *See State v. Guy*, 172 Wis. 2d 86, 101–02, 492 N.W.2d 311, 317 (1992). Our holding that the police improperly entered Paterson's residence establishes that this factor is not satisfied.