STATE of Wisconsin, Plaintiff-Respondent,

v.

Walter HORNGREN, Defendant-Appellant.†

Court of Appeals

*No. 99–2065–CR. Submitted on briefs June 5, 2000.—Decided July 25, 2000.*

## 2000 WI App 177

(Also reported in 617 N.W.2d 508.)

†Petition to review dismissed.

347

On behalf of the defendant-appellant, the cause was submitted on the brief of *James M. Weber* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general and *Christopher G. Wren*, assistant attorney general.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

¶ 1. WEDEMEYER, P.J. Walter Horngren appeals from a judgment entered after he pled guilty to one count of possession with intent to deliver a controlled substance—marijuana—contrary to WIS. STAT. § 961.41(1m)(h)2 (1997–98).[1] Horngren claims the trial court erred when it denied his motion to suppress evidence, which alleged that the police were not justified to enter his apartment under the "community caretaker" function. Because the trial court did not err when it denied Horngren's motion to suppress, we affirm.

## I. BACKGROUND

¶ 2. On June 15, 1998, shortly after 8:00 a.m., the police dispatcher for the City of Greenfield received a telephone call reporting that an individual at 5361 South Tuckaway Lane, Apt. #2 was threatening to commit suicide. Several Greenfield police squads were dispatched to the residence. While en route, the officers were informed that, on two prior occasions, a resident of that apartment, Horngren, had been committed to a mental health facility for attempted suicide. The officers were also advised that one previous suicide attempt involved an overdose of pills. Additionally, the officers were informed that during the investigation of Horngren's previous suicide attempt, several firearms were confiscated, but were subsequently returned.

¶ 3. Once the police officers arrived at the apartment building, Officers Timothy Hanrahan and Michael Davis proceeded to Horngren's apartment. Hanrahan leaned on the door and it opened slightly. A

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

nude male was then seen rushing towards the door attempting to close it. A struggle ensued between Hanrahan, who was trying to push the door open, and Horngren, the nude male, who was trying to push the door closed. The officers succeeded in opening the door, and secured Horngren by placing handcuffs on him.

¶ 4. Police Detective James Bruno then entered the apartment and asked Horngren if anyone else was in the apartment. Horngren said there was a girl in the back bedroom. Bruno proceeded down the hallway looking for the back bedroom. He walked into the room that was in the back of the apartment and looked around. There was no bed in the room; however, he immediately observed a green substance, which he believed to be marijuana, located on top of a desk. He looked in the closet, but did not find the girl.

¶ 5. Bruno looked into the bathroom, but did not see a girl. Then Bruno and Hanrahan entered the middle bedroom, where they found a girl asleep in a bed. She identified herself, told the officers that this was her apartment, that her name was on the lease, that any drugs belonged to Horngren, and gave the officers consent to fully search the apartment. Horngren also consented to the subsequent search.

¶ 6. During the search of the back bedroom, the police officers discovered over 500 grams of marijuana, a triple-beam scale, and other drug paraphernalia. Horngren was arrested and charged with possession with intent to deliver a controlled substance. Horngren filed a motion to suppress the evidence, contending that the entry and initial search of the apartment were conducted in violation of his Fourth Amendment rights. The trial court held a hearing, where both Detective Bruno and Officer Hanrahan testified. The trial court ruled that the actions of the police, after

entering the apartment, were reasonable and did not violate Horngren's Fourth Amendment rights. After the trial court denied the motion seeking suppression, Horngren pled guilty. He now appeals.

## II. DISCUSSION

¶ 7. The issue in this case is whether the trial court erred in denying Horngren's motion to suppress, premised on Horngren's claim that the police were not operating as "community caretakers" when they entered his apartment. When we review a motion to suppress evidence, we will uphold a circuit court's findings of fact unless they are clearly erroneous. *See State v. Eckert*, 203 Wis. 2d 497, 518, 553 N.W.2d 539 (Ct. App. 1996). However, the application of constitutional principles to the facts as found is a question of law which we decide without deference to the circuit court's decision. *See State v. Patricia A.P.*, 195 Wis. 2d 855, 862, 537 N.W.2d 47 (Ct. App. 1995).

¶ 8. The "Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution prohibit unreasonable searches and seizures." *State v. Paterson*, 220 Wis. 2d 526, 532, 583 N.W.2d 190 (Ct. App. 1998). "The warrantless search of a house is presumptively unreasonable." *Id.* However, we recognize that, under special circumstances, there are situations where we cannot "bar law enforcement officials at the doorstep." *State v. Smith*, 131 Wis. 2d 220, 228, 388 N.W.2d 601 (1986).

¶ 9. One of those special circumstances has been identified as the "community caretaking exception," which was first recognized by our supreme court in *Bies v. State*, 76 Wis. 2d 457, 471, 251 N.W.2d 461 (1977). In

evaluating whether police action was justified as "community caretaker" activity, we must first determine whether the conduct involved was truly "bona fide community caretaker activity." *Paterson*, 220 Wis. 2d at 533 (citation omitted). Community caretaker activity is defined as: "being totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *State v. Dull*, 211 Wis. 2d 652, 658, 565 N.W.2d 575 (Ct. App. 1997) (citations omitted). The second part of our inquiry requires a review which weighs the "public good" involved against the level of intrusion on an individual's privacy. *See id.* We must determine whether the Fourth Amendment's standard of "reasonableness" has been satisfied under the facts and circumstances of the individual case. *See id.* (citation omitted).

*A. Entry.*

¶ 10. Horngren contends that the police entry, in response to a suicide threat, was made pursuant to WIS. STAT. § 51.15, "Emergency detention." Therefore, he argues that the entry occurred while the officers were "engaging in traditional law enforcement duties," not community caretaker duties. We disagree.

¶ 11. There is no case in this state that decides whether police action, pursuant to WIS. STAT. § 51.15, falls under community caretaking activity. Therefore, we apply the standards discussed above in making the determination that it does. First, the police response to the suicide threat constituted "bona fide community caretaking." The police were called to the home out of concern that an individual inside might take his own life. The police were acting in a capacity to render immediate aid and assistance. WISCONSIN STAT. § 51.15(1)(a) permits a law enforcement officer to effect

an emergency detention for medical evaluation when the officer "has cause to believe" an individual "is mentally ill . . . and evidences" any of several indications of dangerousness. For an officer to have the requisite "cause to believe," he or she must make a personal observation, *see* WIS. STAT. § 51.15(1)(b)1., or have knowledge of a "specific recent overt act or attempt or threat to act or omission by the individual which is reliably reported to the officer . . . by any other person," WIS. STAT. § 51.15(1)(b)2. "[R]ecent threats of or attempts at suicide" serve as one indication, explicitly recognized by statutes, of a person's dangerousness. *See* WIS. STAT. § 51.15(1)(a)1.

¶ 12. Here, the police were dispatched to a home after a report that an individual there was threatening to commit suicide. The police were advised that two previous suicide attempts had occurred and that there were several guns in the home. Truly, the motivation in investigating the complaint was to render aid, not to investigate any criminal activity. As evidenced during the suppression hearing testimony, the officers' actual motivation was to render immediate assistance, not to obtain evidence for a possible prosecution.

¶ 13. The facts presented here do not involve "traditional enforcement of penal and regulatory laws." *Dull*, 211 Wis. 2d at 658 (citation omitted). The situation does not involve crime-fighting activities. Rather, as the State points out, "a response under Chapter 51 all but defines the 'community caretaking' responsibilities of law enforcement officers." We conclude that the first part of the standard has been satisfied.

¶ 14. With regard to the second part of the standard, the balancing test, we are satisfied that the public good arising from the caretaking activity outweighed the intrusion into the individual privacy that

resulted. *See id.* After conducting the balancing test with an overall vision as to whether the intrusion was reasonable, we conclude that it was. *See id.* Here, the public good involved preventing a suicide, and securing medical assistance for a troubled individual. The intrusion involved entry without a warrant into an individual's home. After applying the four factors that offer us guidance, we are satisfied the entry was justified. These four factors include: (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the search, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability and effectiveness of alternatives to the type of intrusion actually accomplished. *See Paterson*, 220 Wis. 2d at 533–34 (citation omitted).

¶ 15. The first factor favors the entry. Preventing someone from taking his own life is of the utmost of public concern; it is well within the traditional community commonweal power. The exigency of such a situation is obvious. A suicide can occur in a matter of minutes. The second factor provides the circumstances surrounding the entry, which occurred at 8:00 a.m., into Horngren's home, with some force in order to enter, but only after observing an agitated naked man running toward the door. Moreover, the police did not control the time or location, but were responding to a suicide call. Thus, the attendant circumstances factor does not render the entry unreasonable. The third factor is inapplicable here. The fourth factor addresses alternatives to the entry effected. Horngren suggested that the police could have telephoned before entering, or they could have knocked and announced themselves. While there were a number of less intrusive alterna-

tives available, those less intrusive means, under the circumstances in this case, were simply not feasible.

¶ 16. Horngren had made two previous suicide attempts, which resulted in his commitment. He had access to deadly weapons. The police did not know whether he was alone. Phoning to alert Horngren that the police were coming would have been counterproductive. The time before the police arrived may have provided him with sufficient time to carry out his threat, or given him the extra push needed to accomplish his threat, in order to avoid a third commitment. Further, as pointed out by the trial court, an individual threatening suicide is "under great stress and rather overwhelmingly unstable." Given that state of mind, a warning that police were on their way to offer assistance was not a reasonable alternative.

¶ 17. Further, other suggestions, such as knocking at the door, were thwarted when the door popped open and the struggle ensued. If Horngren's door had been tightly closed and locked, the police officers would have faced a different decision. Here, that circumstance did not confront the police. The door was not locked or tightly closed. By slightly leaning on the door, the officer popped it open, which resulted in Horngren rushing to close it. At that point, the split-second decision the officer made to use force to open the door cannot be deemed unreasonable. We conclude that the balancing test tips in favor of police action. In coming to the aid of Horngren, when it was believed he was in danger of death or physical harm, the police were endeavoring to accomplish public good.

¶ 18. Accordingly, we affirm the trial court's decision that the police were acting as community caretakers when they entered Horngren's apartment.

We concur in the trial court's ruling that the police entered the apartment with the motivation to render aid, not to collect evidence. The " 'community caretaker' function of the police which, while perhaps lacking in some respects the urgency of criminal investigation, is nevertheless an important and essential part of the police role." *Bies*, 76 Wis. 2d at 471. We heartily endorse the words of the California Supreme Court, which recently advised against taking a too-narrow view of the community caretaker function:

> An officer "less willing" to discharge community caretaking functions implicates seriously undesirable consequences for society at large: In that event, we might reasonably anticipate "the assistance role of law enforcement . . . in this society will go downhill. . . . The police cannot obtain a warrant for . . . entry. [W]ithout a warrant, the police are powerless. In the future police will tell such concerned citizens, 'Sorry. We can't help you. We need a warrant and can't get one.' "

*People v. Ray*, 981 P.2d 928, 939 (Cal. 1999) (citations omitted), *cert. denied*, 120 S. Ct. 1240 (2000).

## B. Search.

¶ 19. Horngren contends that, even if the entry was permitted pursuant to the community caretaker function, the initial cursory search of the other rooms, which resulted in Detective Bruno's discovery of the marijuana, was unconstitutional. He claims that the "protective sweep" doctrine does not apply here because it authorizes a brief search, *incident to an arrest*, of the areas immediately adjoining the place of arrest. *See State v. Kruse*, 175 Wis. 2d 89, 95, 499 N.W.2d 185 (Ct. App. 1993). He points out that there

was no arrest and, therefore, no justification to conduct a protective sweep. We disagree.

¶ 20. "A protective sweep is a brief search of the premises, *ordinarily* occurring during an arrest, to ensure the safety of those on the scene." *Guseman v. Martinez*, 1 F. Supp. 2d 1240, 1254 (D. Kan. 1998) (emphasis added). An arrest, however, does not define the sole context in which a protective sweep can constitutionally occur. Rather, within the purview of a bona fide community caretaker activity, the reasonableness of an officer's actions, evaluated under the totality of the circumstances, determines the constitutionality of the officer's conduct. *See Dull*, 211 Wis. 2d at 658. Thus, the question is whether the "sweep" that occurred here was reasonable under the circumstances. We conclude that it was.

■

¶ 21. After the police entered the apartment and handcuffed Horngren, they asked him if there was anyone else in the apartment. He told them there was a girl in the back bedroom. Thus, the police were presented with a situation where a nude male adult stands before them telling them there is "a girl" in the back bedroom. The police had been summoned to the apartment pursuant to a suicide threat, and they suspected weapons on the premises. Despite the struggle and noise, there had been no response from "the girl." It would have been unreasonable for the police not to check on the status of the girl under these circumstances. Was she in danger or did she pose a danger to the officers' safety? Accordingly, the limited search that occurred was reasonable and did not violate Horngren's constitutional rights.[2]

---

[2] The State urges us to adopt different terminology for the cursory search incident to the community caretaking role. It

## C. Plain View Doctrine.

¶ 22. Finally, Horngren concedes that if we decide the cursory search of the apartment was lawful, it is undisputed that the marijuana sitting on the desk was in plain view and, therefore, lawfully seized. We have so concluded. Accordingly, we need not address this issue further.

*By the Court.*—Judgment affirmed.

recommends that we label the quick sweep in community caretaker cases as "caretaker sweep," so that it will not be confused with the protective sweep associated with a lawful arrest. We perceive this request as an attempt to declare new law that a "caretaker sweep" is permitted in every situation where the police are functioning as community caretakers. We decline to do so. There may be situations and circumstances where a cursory search of the area is not warranted and, therefore, we are unwilling to create such an extension. These cases must be examined on a case-by-case basis to determine the reasonableness of the conduct itself.