STATE of Wisconsin, Plaintiff-Respondent,

v.

Todd Lee KRAMER, Defendant-Appellant.†

Court of Appeals

*No. 2007AP1834–CR. Submitted on briefs February 8, 2008.
—Decided March 27, 2008.*

2008 WI App 62

(Also reported in 750 N.W.2d 941.)

† Petition to review granted 6/11/08.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Stephen J. Eisenberg* of *Eisenberg Law Offices, S.C.*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Stephen W. Kleinmaier*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Higginbotham, P.J., Lundsten and Bridge, JJ.

¶ 1. LUNDSTEN, J. This is a Fourth Amendment "community caretaker" case. Todd Kramer appeals a circuit court judgment convicting him of operating a motor vehicle while under the influence of an intoxicant. Some unknown time after Kramer pulled his pickup truck over to the side of a highway with its

hazard lights flashing, a police officer happened by. The officer decided to check on the stopped truck. With the squad's red and blue emergency lights activated, the officer pulled in behind the truck to inquire whether Kramer needed assistance. This inquiry led to the discovery that Kramer was intoxicated. Kramer argues that he was unlawfully seized by the time the officer approached Kramer's side window and observed signs of intoxication. We disagree. Assuming that a seizure occurred, we conclude that it was lawful because the officer was acting in a community caretaker capacity. We affirm the judgment.

### *Background*

¶ 2.   Kramer moved to suppress evidence of his intoxicated driving acquired after the officer pulled up behind his truck and approached his side window. At a hearing on the motion, the arresting officer testified that he was on patrol on a county highway when he observed a truck parked on the shoulder of the roadway with its hazard lights on. It was late August, approximately 8:45 p.m., and dark outside. The officer did not know how long the truck had been there, and did not see inside the truck as he passed it.

¶ 3.   The truck appeared to be legally parked, and it was not impeding traffic or jeopardizing public safety. Aside from being stopped on a roadside with its hazard lights flashing, the truck did not appear damaged or disabled. The officer observed nothing suggesting that a crime was being committed or that any traffic law was being broken.

¶ 4.   The officer made a U-turn, activated his red and blue emergency lights, and pulled in behind the truck to see if there was a need for help. The officer

471

approached Kramer's truck with his hand on his gun, something the officer always did when he approached a stopped vehicle "for safety considerations." In addition, the officer shined a light in the back of Kramer's truck in an attempt to see inside, again for "safety concerns."

¶ 5. The officer's first words to Kramer were something to the effect of "Can I help you?" At that point, the officer noticed that Kramer's speech was slurred, and he could smell the odor of intoxicants coming from inside Kramer's truck. Subsequent investigation led to Kramer's arrest and conviction.

¶ 6. Kramer's testimony was brief. Kramer explained that he had pulled over to take a phone call, and had activated his hazard lights because there was a hill nearby and he wanted other vehicles to see him.

¶ 7. The circuit court denied Kramer's suppression motion, apparently assuming that a seizure occurred, but concluding that the seizure was legal because the officer was acting as a community caretaker by stopping to inquire into the situation.

### *Standard Of Review For Suppression Decisions*

¶ 8. When we review a motion to suppress, we uphold the circuit court's findings of fact unless those findings are clearly erroneous. *State v. Horngren*, 2000 WI App 177, ¶ 7, 238 Wis. 2d 347, 617 N.W.2d 508. The application of constitutional principles to the facts is a question of law that we review *de novo. Id.*

### *Discussion*

¶ 9. The seizure in this case was justified, if at all, because the officer was acting in his community caretaker capacity. We will assume, without deciding, that

472

the officer lacked reasonable suspicion or probable cause when he seized Kramer by activating his red and blue emergency lights, pulling his squad car in behind Kramer's truck, and approaching the truck on foot. If the officer was not acting in his community caretaker capacity at the time of this seizure, it was unlawful and the evidence of intoxication must be suppressed.[1]

¶ 10. In *State v. Anderson*, 142 Wis. 2d 162, 417 N.W.2d 411 (Ct. App. 1987), we adopted a test for determining when a seizure is justified by the community caretaker function. We held that, if there is a seizure, the community caretaker function justifies that seizure if two requirements are met. First, the police activity must be a "bona fide community caretaker activity." *Id.* at 169. Second, "the public need and interest outweigh the intrusion upon the privacy of the individual." *Id.* We explained that the balancing aspect of this test requires "an objective analysis of the circumstances confronting the police officer" and "an objective assessment of the intrusion upon the privacy of the citizen." *Id.* at 168.

¶ 11. In the sections below, we first examine whether the police officer here was engaged in a bona fide community caretaker activity. We then engage in balancing the "public need and interest" against the "intrusion upon the privacy of the individual." Finally, we comment on the *Anderson* formulation of the community caretaker analysis and suggest that the analysis

---

[1] The State does not argue that the officer possessed reasonable suspicion or probable cause to temporarily seize Kramer. The State does, however, contend that there was no seizure. We need not resolve this question because we agree with the State that, assuming a seizure occurred, it was justified by the officer's community caretaker function.

is inconsistent with longstanding Fourth Amendment search and seizure principles.

## A. Bona Fide Community Caretaker Activity

¶ 12.   The *Anderson* requirement that police must be engaged in a "bona fide community caretaker activity" is met only if the police activity is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *State v. Dull*, 211 Wis. 2d 652, 658, 565 N.W.2d 575 (Ct. App. 1997) (internal quotation marks omitted; quoting *Anderson*, 142 Wis. 2d at 166 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973))).

¶ 13.   There is no dispute that, but for the officer's *subjective* concerns when he approached Kramer's truck, the officer was acting in his community caretaker capacity when the seizure occurred. Kramer argues, however, that the officer was not engaged in a "bona fide community caretaker activity" because the officer's conduct was not "totally divorced" from the officer's law enforcement function. More specifically, Kramer points out that the officer testified that it "was in [the officer's] mind" that a crime might be going on; that the officer was not sure what was going on in Kramer's truck, but that concerns about something illegal are "always in [the officer's] mind"; and that "[i]t could have been anything" going on in the truck. Thus, according to Kramer, the officer's conduct did not meet the "totally divorced" rule.

¶ 14.   Kramer's argument assumes that we may rely on the officer's subjective concern about the possibility of criminal activity to conclude that his motiva-

tion, in seizing Kramer and checking on him, supports a conclusion that the officer was not motivated only by a desire to assist Kramer if help was needed and, therefore, was not engaged in activity "totally divorced" from the officer's law enforcement function. Kramer's assumption is supported by cases such as *Horngren*, 238 Wis. 2d 347, in which we considered an officer's actual motivation in deciding whether the officer's conduct fit the community caretaker function. *See id.*, ¶¶ 10–12. As explained in section C below, we question whether an officer's subjective motivation should be relevant to this Fourth Amendment seizure question. Here, however, we assume that the officer's subjective motivation is relevant. Nonetheless, we conclude that the officer's subjective concern that the innocent-seeming situation he faced might turn out to be dangerous or involve criminality does not prevent the officer's activity from being a bona fide community caretaker activity.

¶ 15. Whatever the precise meaning of "totally divorced," it cannot mean what Kramer is suggesting. In other words, it cannot mean that an officer must have subjectively ruled out all possibility of criminal activity in order to act in a community caretaker capacity. Police commonly act as community caretakers in situations where it remains reasonably possible that they will discover some criminal activity. *See, e.g., State v. Ziedonis*, 2005 WI App 249, ¶¶ 2–3, 17, 287 Wis. 2d 831, 707 N.W.2d 565 (no dispute that police were acting as bona fide community caretakers when they first approached dwelling in response to a loose animal complaint involving two vicious dogs that were "chasing people around"); *State v. Ferguson*, 2001 WI App 102, ¶ 13, 244 Wis. 2d 17, 629 N.W.2d 788 (police were engaged in bona fide community caretaker activity

when investigating a call about a fight that led to discovery of underage drinkers); *Dull*, 211 Wis. 2d at 659–60 (officer investigating a noise complaint was initially acting as community caretaker, even though officer's role as community caretaker ended when officer determined that juvenile was intoxicated and took him into custody under the juvenile justice code).

¶ 16.   If the meaning of "totally divorced" were as Kramer suggests, the situations in which an officer could lawfully perform valuable community caretaker services would be few and far between. This court has previously cautioned against a "too-narrow view" of the community caretaker function, lest police officers be dissuaded from discharging that function. *See Ziedonis*, 287 Wis. 2d 831, ¶ 15; *see also Horngren*, 238 Wis. 2d 347, ¶ 18.

¶ 17.   Accordingly, because we reject Kramer's "totally divorced" argument and because, apart from this argument, it is undisputed that the officer was engaged in a "bona fide community caretaker activity," we conclude that the officer was acting as a bona fide community caretaker within the meaning of *Anderson* at the time of the seizure.

## B. The Balancing Test

¶ 18.   The *Anderson* requirement that "the public need and interest outweigh the intrusion upon the privacy of the individual" requires consideration of the following factors:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an

476

automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Anderson*, 142 Wis. 2d at 169–70 (footnotes omitted). Kramer makes several arguments in light of these factors. We address and reject each of those arguments in the following paragraphs.

¶ 19.   Under the first factor, Kramer argues that the public interest in the officer's conduct was low. We disagree. The public has a substantial interest in encouraging police officers to be on the look-out for and offer aid to motorists who may be stranded or otherwise in need of assistance. "Contacts of this sort are not only authorized, but constitute an important duty of law enforcement officers." *State v. Goebel*, 103 Wis. 2d 203, 208, 307 N.W.2d 915 (1981) (officer stopped to see if a motorist who had pulled to the side of the road was in need of assistance).

¶ 20.   Kramer seems to be arguing that this interest was not implicated here because he was not attempting to signal for help and because there was no indication that he or his truck was in distress. This argument misses the mark because Kramer's flashing hazard lights signaled to any reasonable observer that Kramer or his truck might be experiencing some sort of problem. It is common knowledge that motorists with vehicle trouble often pull over and activate their hazard lights without taking additional steps to flag down passers-by.

¶ 21.   Also under the first factor, Kramer argues that there were no exigent circumstances. We agree that there was no significant indication that immediate assistance was needed. But it remains true that one

477

possible explanation for the stopped truck was that an occupant was in distress. Thus, we conclude that this factor favors Kramer, but only slightly.

¶ 22. Under the second factor, Kramer notes that the officer made a display of authority by activating his red and blue emergency lights. We agree that this is a display of authority, but also agree with the State that it was a reasonable caretaker measure. In particular, the red and blue emergency lights minimize the danger created by passing motorists who may not be attentive, a danger inherent in roadside stops along highways.

¶ 23. Also under the second factor, Kramer points out that the officer approached Kramer's truck with his hand on top of his gun. But this is a limited show of authority that does not convince us, alone or in combination with other factors, that the public interest was outweighed in this instance.

¶ 24. Under the third factor, we consider whether an automobile is involved. Kramer concedes that there is a lesser expectation of privacy in automobiles than in dwellings, but he nonetheless suggests that this factor weighs in favor of a conclusion that the public interest is outweighed in this case. In support, Kramer relies on *State v. Clark*, 2003 WI App 121, ¶ 27, 265 Wis. 2d 557, 666 N.W.2d 112, where we stated that a citizen can reasonably expect to leave a vehicle legally parked without the vehicle being towed. But the obvious pertinent distinction between towing a legally parked vehicle and checking on a vehicle stopped alongside a highway needs no explanation.

¶ 25. Regarding the fourth factor—the availability, feasibility, and effectiveness of alternatives to the type of intrusion the officer used—Kramer points out that the intrusion must be "as limited as is reasonably possible, consistent with the purpose justifying it in the

first instance." *Anderson*, 142 Wis. 2d at 169. Kramer argues that the officer had other reasonable, less intrusive alternatives and that, because the officer did not utilize one of these alternatives, the seizure was unreasonable. We disagree because none of Kramer's suggested alternatives are as reasonable as the one chosen by the officer.

¶ 26.   Kramer suggests, for example, that the officer could have pulled alongside Kramer's truck and, without getting out, motioned to Kramer to roll down his window so the officer could ask if everything was all right. Kramer also suggests that the officer could have continued on his patrol route and returned a few minutes later, or, "[e]ven better, . . . could even have simply parked his squad car nearby—someplace visible to Kramer—to observe [Kramer's truck] for a few minutes."

¶ 27.   Kramer's suggested alternatives may or may not be reasonable, but they are not the most effective responses under the circumstances because they would have required that the officer allow additional time to pass or would have required the officer to stop in the middle of the roadway. Allowing additional time to pass before checking on Kramer could have merely aggravated a time-sensitive situation. For example, someone in Kramer's vehicle may have needed immediate medical attention, and this fact may not have been apparent if viewed from afar. It would have been more dangerous for the officer and for passing vehicles if the officer had stopped in a lane of traffic, particularly in light of Kramer's testimony that he activated his hazard lights because he was near a hill and wanted other vehicles to see him.

¶ 28.   Kramer also suggests that the officer could have driven by and "visually viewed what was going on"

or could have used his headlights to view any movement inside Kramer's truck. In making this suggestion, Kramer assumes too much about what was likely feasible under the circumstances. It was dark, and the officer testified that he was traveling at 55 miles per hour (or a bit less) when he saw Kramer's truck. Even assuming, however, that it was feasible for the officer to see inside Kramer's truck as the officer passed by, nothing the officer would have seen would have been likely to have confirmed that no one needed assistance.[2]

¶ 29. Having considered Kramer's arguments in light of the relevant factors, we conclude that the officer was lawfully acting in a community caretaker role. The public has a substantial need for and interest in encouraging police to offer help when faced with situations like the officer faced here. In many such situations, citizens would *want* an officer to stop and offer assistance. The public need and interest here outweigh the limited intrusion into Kramer's privacy.

## C. Commentary On The "Totally Divorced" Rule

¶ 30. It appears that the *Anderson* "totally divorced" rule used in Wisconsin to determine whether an officer is acting in a community caretaker capacity is inconsistent with well-settled law holding that police actions in search and seizure cases under the Fourth Amendment are judged by an objective standard. Because we are bound by our own community caretaker

---

[2] Kramer also challenges the circuit court's decision based on the court's comment that the officer had "all sorts of alternatives." However, read in context, it is clear the court was saying that, although there may have been any number of alternatives, none of those alternatives would have been reasonable under the circumstances.

precedent, we only comment here. Our comment does not affect our decision. If there is to be a change in Wisconsin's community caretaker law, it must come from our supreme court.

¶ 31. As a unanimous United States Supreme Court recently explained: "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.'" *Brigham City, Utah v. Stuart,* 547 U.S. 398, 404 (2006) (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978)) (emphasis added in *Brigham City*); *see also Whren v. United States,* 517 U.S. 806, 813 (1996) (United States Supreme Court "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers").

¶ 32. The reason for this objective approach is that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer." *Horton v. California,* 496 U.S. 128, 138 (1990). Society's interest in assistance and protection, and the constitutional rights of suspects, should not depend on the happenstance of a particular officer's subjective motivation. Consequently, in *Brigham City,* the Court declined to address the defendant's argument that an entry into a residence was illegal because police were subjectively motivated, in part, by an interest in making arrests when they entered to quell a disturbance. *See Brigham City,* 547 U.S. at 404–05.

¶ 33. Wisconsin has, with the exception of community caretaker law, uniformly adopted an objective standard when addressing Fourth Amendment questions. *E.g., State v. Sykes,* 2005 WI 48, ¶¶ 29–31, 279 Wis. 2d 742, 695 N.W.2d 277 (officer's subjective intent

not relevant to whether there was probable cause to arrest); *State v. Malone*, 2004 WI 108, ¶ 23, 274 Wis. 2d 540, 683 N.W.2d 1 (officer's "subjective motivation may have been to pursue suspected narcotics trafficking, but his subjective motivations play no part in our analysis"); *State v. McGill*, 2000 WI 38, ¶¶ 23–24, 234 Wis. 2d 560, 609 N.W.2d 795 (in determining whether a protective frisk was warranted, court considered facts known to the officer which the officer did not use in his "subjective analysis of the situation"); *State v. Larsen*, 2007 WI App 147, ¶¶ 18–21, 302 Wis. 2d 718, 736 N.W.2d 211 (applying the objective test to an emergency doctrine search), *review denied,* 2007 WI 120, 304 Wis. 2d 611, 741 N.W.2d 241 (No. 2006AP1396–CR); *State v. Anderson*, 149 Wis. 2d 663, 675, 439 N.W.2d 840 (Ct. App. 1989) ("The fact that the officer does not have the state of mind which is hypothesized by the reasons which provide the legal justification for the officers' action [seizure of a vehicle] does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action."), *rev'd on other grounds,* 155 Wis. 2d 77, 454 N.W.2d 763 (1990).

¶ 34. One caveat involving a subtle distinction must be made. In *State v. Kyles*, 2004 WI 15, 269 Wis. 2d 1, 675 N.W.2d 449, the court held that "an officer may be questioned [at a suppression hearing] about [subjective fears] and that a court may consider an officer's [subjective fears] in determining whether the objective standard" is met. *Id.*, ¶ 39. Properly read, *Kyles* is completely consistent with the objective standard. The court was clear that a purely objective standard must be applied to the reasonableness of an officer's actions. *Id.* There is no suggestion in *Kyles* that a court may rely on an officer's subjective thoughts to conclude that, because an officer had a particular subjective state of

mind, an action was either legal or illegal. To the contrary, the *Kyles* court observed that the "law is very clear" that "a [protective] frisk [for weapons] can be valid when an officer does not actually feel threatened by the person frisked." *Id.*, ¶ 23. Read in context, the *Kyles* court is apparently explaining that there may be a sort of brainstorming benefit in hearing an officer's subjective thoughts, akin to hearing argument from counsel about what is objectively reasonable under the circumstances.

¶ 35.   In sum, apart from the community care- taker law we apply today, well-settled Fourth Amend- ment law provides that a search or seizure may not be found legal or illegal *because of* an officer's subjective motives or thoughts.

¶ 36.   The reason community caretaker cases in Wisconsin have strayed from well-settled Fourth Amendment law appears to be that, in *Anderson,* we misinterpreted the United States Supreme Court's de- cision in *Cady.* It seems the same sort of misreading of *Cady* occurred in Illinois, prompting an appellate court justice there to explain the misreading and propose a course correction, albeit in a concurrence. Because the case law addressed by the Illinois justice is essentially the same as Wisconsin case law, and because the justice aptly addresses the topic, we begin by quoting from that concurrence.

¶ 37.   In *People v. Cordero*, 830 N.E.2d 830 (Ill. App. Ct. 2005), Presiding Justice O'Malley wrote, in concurrence:

> [W]hether a seizure is justified on community caretak- ing grounds does not depend on the officer's subjective purposes in effecting the seizure so long as his actions are objectively reasonable under the circumstances.

Our district [of the Illinois Court of Appeals] has in the past fallen into a subjectivist error. Thus, in [one case we] said: "The 'community caretaking' function *must be* completely divorced from any *initial suspicion* of criminal activity." (Emphasis added.) . . . [In another case we] said: "When an officer questions an individual to check on his well-being, *without initial thought of criminal activity, he is within the purview of community caretaking.*" (Emphasis added.) . . . This approach is improper. The test for determining whether a seizure is justified is objective, the question being whether the facts and circumstances known to the officer at the time of the seizure warranted his action. An officer's testimony is relevant not for what it reveals about his inner thoughts, but for what it discloses about the objective circumstances of the encounter.

[Our] error in . . . these other cases is rooted in a misunderstanding of the language from *Cady*, . . . that police officers " 'frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' " *Cady* was noting that many police-citizen encounters have nothing to do with crime, not requiring that they must have nothing to do with crime . . . . Notably, *Cady* did not require the police officers in that case to have had a certain subjective state of mind in order to justify their search of the defendant's car . . . . However, what *Cady* . . . intended as descriptive has been transformed into a prescription in this district's cases, culminating in [our] subjectivist error.

. . . .

. . . Again, the test of whether a seizure is justified is objective, and so a seizure may not be deemed unreasonable based on the officer's subjective beliefs.

For example, if an officer effects a seizure while believing, unreasonably, that criminal activity is afoot, the State is not precluded from proffering a community caretaking rationale for the officer's action based on an objective assessment of the circumstances.

*Id.* at 840–42 (O'Malley, P.J., concurring) (citations omitted).

¶ 38. In Wisconsin, as in Illinois, we interpreted *Cady's observation*—that many police-citizen encounters are "totally divorced" from the enforcement of laws—as a community caretaker *requirement. See State v. Fields,* 2000 WI App 218, ¶ 12, 239 Wis. 2d 38, 619 N.W.2d 279 ("[C]ommunity caretaking functions *must be* 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' ") (emphasis added; citation omitted); *Anderson,* 142 Wis. 2d at 166 ("[I]n [*Cady*] . . . a warrantless search of a vehicle was permitted *because* the police were engaged in ' . . . community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' ") (emphasis added; quoting *Cady,* 413 U.S. at 441); *accord Ziedonis,* 287 Wis. 2d 831, ¶ 14; *Ferguson,* 244 Wis. 2d 17, ¶ 10;[3] *Horngren,* 238 Wis. 2d 347, ¶ 9; *Dull,* 211 Wis. 2d at 658.

¶ 39. Also, as in Illinois, our interpretation of *Cady* has led us to conclude that the subjective motivation of a police officer sometimes controls whether the

---

[3] We also question our contention in *State v. Ferguson,* 2001 WI App 102, 244 Wis. 2d 17, 629 N.W.2d 788, that police were engaged in a community caretaker activity because they were investigating conduct punishable by a forfeiture rather than "investigating a crime." *Id.*, ¶ 13. It is not apparent why the investigation of a possible violation of law punishable by a forfeiture is a community caretaker activity.

officer is engaged in a bona fide community caretaker function. In *Ferguson*, we relied on "the trial court's finding that the motivation for the police to enter Ferguson's bedroom closet was to assist him, not to arrest" in concluding that the officer was acting in a community caretaker capacity. *Ferguson*, 244 Wis. 2d 17, ¶ 15. In *Horngren*, we similarly relied on testimony that "the officers' actual motivation was to render immediate assistance, not to obtain evidence for a possible prosecution." *Horngren*, 238 Wis. 2d 347, ¶ 12. In *Dull*, we commented on the defendant's argument that an officer was subjectively motivated by a suspicion of criminal conduct when he entered a residence, and plainly implied that this subjective motivation might be relevant if the officer had not already stepped outside his community caretaker function. *See Dull*, 211 Wis. 2d at 661–63.

¶ 40. We note that in addition to the objective/subjective issue, our interpretation of the "totally divorced" language in *Cady* suggests that a bona fide community caretaker activity may not simultaneously involve a law enforcement activity. We wonder whether the two are mutually exclusive. For example, is an officer acting to assist person A, while simultaneously investigating person B, necessarily not acting in a community caretaker capacity with respect to person A because the officer's activity is not totally divorced from law enforcement activity? In *State v. Paterson*, 220 Wis. 2d 526, 583 N.W.2d 190 (Ct. App. 1998), we commented on, but did not resolve, the State's assertion that sometimes police activity cannot easily be catalogued and is sometimes a blend of both the community caretaker function and the criminal investigation function. *Id.* at 534 n.1 In *Paterson*, we found it unnecessary to resolve the question because, even assuming the police were engaged in a

bona fide community caretaker activity, the balancing part of the *Anderson* test was not met. *Paterson,* 220 Wis. 2d at 535–36.

¶ 41.   We do not suggest that the entire community caretaker analysis used in Wisconsin is problematic. To the contrary, the most significant aspect of our current test is the directive that courts consider four factors in balancing the public need and interest in the officer's action with the intrusion on individual privacy. *See, e.g., Anderson,* 142 Wis. 2d at 169–70. The *Anderson* balancing requirement tracks what Presiding Justice O'Malley in *Cordero* recommends as the full community caretaker test. *See Cordero,* 830 N.E.2d at 841–42 (O'Malley, P.J., concurring) (suggesting a case-by-case balancing of the individual's interest in proceeding about his or her business, unfettered by police, against the public's interest in having police officers perform public assistance services).

### Conclusion

¶ 42.   We assume, without deciding, that a seizure had occurred by the time the officer observed signs of intoxication. Nonetheless, we agree with the circuit court that the seizure was lawful because the officer was acting in a community caretaker capacity. Accordingly, we affirm.

*By the Court.*—Judgment affirmed.