STATE of Wisconsin, Plaintiff-Respondent,

v.

Gregory J. DULL, Defendant-Appellant.

Court of Appeals

*No. 96–1744–CR. Submitted on briefs March 21, 1997.—Decided May 7, 1997.*

(Also reported in 565 N.W.2d 575.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Scott R. Letteney* of *Hudec Law Offices, S.C.,* of Lake Geneva.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney

general, and *Marguerite M. Moeller,* assistant attorney general.

Before Snyder, P.J., Brown and Anderson, JJ.

BROWN, J.   Without a warrant, and without consent, a sheriff's deputy opened Gregory J. Dull's closed bedroom door and went inside. The deputy had taken custody of Gregory's younger brother, Matthew, for underage drinking and testified that he wanted to leave him with Gregory. The trial court accepted the deputy's explanation and determined that the deputy acted reasonably when he entered Gregory's home and bedroom for this reason. We disagree that the deputy's conduct was reasonable and direct the trial court to suppress the deputy's testimony about how he found Gregory in bed with a fourteen-year-old girl.

As a result of what the deputy observed, the State charged Gregory with sexual assault of a child, *see* § 948.02, STATS., and with causing a child to expose his or her genitals. *See* § 948.10, STATS. After the trial court denied Gregory's suppression motion, Gregory pled no contest to the sexual assault charge. The other charge was dismissed and read in for sentencing.

This appeal only concerns the trial court's decision to deny the motion to suppress "all evidence" gathered as a result of the deputy's entry into Gregory's bedroom and the "testimony which would flow therefrom." The essence of the trial court's reasoning is captured in the following finding: "[T]he [deputy] was well within his rights to make a determination as to whether there was an adult on the premises in order to determine if Matthew was indeed releasable and did not have to be removed from what was clearly his home." Gregory contends that the trial court erred in this analysis.

654

We apply a two-part standard to a ruling on a suppression motion. We show great deference to the trial court's factual findings and will not reverse unless they are clearly erroneous. *See State v. Guzy,* 139 Wis. 2d 663, 671, 407 N.W.2d 548, 552 (1987). Nonetheless, the legal determination of whether those facts warrant suppression of the evidence is a matter which we review independently of the trial court. *See id.*

We accordingly begin with the trial court's factual findings. The deputy and his partner were dispatched to the Dull residence at about 4:00 a.m. to answer a noise complaint. When they arrived, the deputy saw Matthew in front of the house talking with a teenage girl. The deputy identified them and confirmed that they were juveniles. Matthew was fifteen and the girl was fourteen or fifteen.

While the deputy was talking with Matthew, he noticed that Matthew smelled like he had been consuming alcohol. The deputy therefore administered a preliminary breath test. Matthew's test yielded a result of 0.06%.

Meanwhile, the deputy's partner questioned the girl who was in the front yard with Matthew. She also tested positive for alcohol and was placed in custody. The partner put her in the squad car because he planned to take her to the juvenile center until her parents could be contacted.

The deputy likewise placed Matthew in custody. The deputy asked Matthew if there was an adult in the house whom the deputy could leave Matthew with. Matthew told him that his father was at the Milwaukee Huber facility and that his mother was not at home. Nonetheless, Matthew volunteered that his older brother Gregory (who was twenty-one) was inside.

However, Matthew told the deputy that Gregory was sleeping and offered to have the deputy wait outside while he went in to retrieve Gregory. But the deputy had concerns with this plan. On other occasions when he had previously let juveniles go inside their homes for similar reasons, the deputy had been left "outside looking in" with no one willing to "re-answer the door."

While Matthew still argued to the deputy that "he couldn't enter because he didn't have a warrant," once the deputy explained to Matthew that he was in custody and would remain in his custody until he made personal contact with Gregory, Matthew permitted the deputy to go inside the house. Once they were inside, Matthew continued to hesitate, explaining to the deputy that "he didn't think he should allow [him] to proceed any further." Nonetheless, Matthew eventually led the deputy downstairs to Gregory's bedroom, but the door was shut.

Loud music was coming from inside and Matthew and the deputy knocked on the door several times. When there was no response, the deputy opened the door and he and Matthew went inside to awake Gregory.

When the deputy entered, Gregory awoke and started to get up from the bed. The deputy approached him and pulled back the covers. The deputy saw that Gregory was in bed with a juvenile girl and that both were naked.

Before we turn to our legal analysis, we note the State's contention that the trial court never resolved whether the deputy or Matthew opened the bedroom door and initiated entry. The State refers us to the portions of the testimony which show that the testimony about this fact was disputed; the deputy and

Matthew each claimed that the other actually opened the door. The State further contends that the trial court's oral findings are ambiguous in regard to how it resolved this conflict.

We reject the State's claim that the findings are ambiguous. The court described the events that took place outside Gregory's door in this way:

> They could hear loud music. It was quite clear from the testimony that Matthew was convinced that his brother was in there. The only way under those circumstances [it] certainly was appropriate for *the officer to open the door to make inquiry*. [Emphasis added.]

Although the trial court made a legal determination that it was "appropriate" for the deputy to open the door, the court plainly made the *factual* finding that the deputy opened it, not Matthew.

Having set out the historical facts, we now turn to the legal question of whether the deputy's warrantless entry into the house and eventually into Gregory's bedroom violated the Fourth Amendment. The State offers two explanations of why it did not.

First, the State refines the argument it successfully presented to the trial court and argues that the deputy was acting as a "community caretaker" who was only interested in Matthew's safety. *See generally Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). The State describes how the Juvenile Justice Code authorized the deputy to take custody of Matthew in these circumstances and further mandated that the deputy attempt to find a responsible adult with whom he could leave Matthew. *See* § 938.19(1)(d)8, STATS.; *see also* § 938.20(2)(b), STATS.

657

This court set out an analysis for evaluating "community caretaker" claims in *State v. Anderson,* 142 Wis. 2d 162, 169, 417 N.W.2d 411, 414 (Ct. App. 1987), *rev'd on other grounds,* 155 Wis. 2d 77, 454 N.W.2d 763 (1990). There we explained that after a Fourth Amendment entry has occurred, a court must make two more inquiries before applying this principle as a justification for that conduct. First, the court must determine whether the law enforcement officer was engaged in a "bona fide community caretaker activity." *See id.* Next, the court must weigh and balance the public good arising from the alleged caretaking activity against the intrusion into individual privacy that resulted and make a determination about the overall "reasonableness" of the conduct. *See id.* at 169–70, 417 N.W.2d at 414. The trial court's determinations about the nature of the conduct and the reasonableness of the conduct, like other legal issues arising in suppression matters, are subject to our independent review. *See Guzy,* 139 Wis. 2d at 671, 407 N.W.2d at 552.

With regard to the first phase of the inquiry, in *Anderson* we defined the community caretaking function as being " 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' " *See Anderson,* 142 Wis. 2d at 166, 417 N.W.2d at 413 (quoting *Cady,* 413 U.S. at 441). In addition, we noted our approval of the analysis conducted by the Washington Court of Appeals in *State v. Chisholm,* 696 P.2d 41, 43 (Wash. App. 1985), which identified community caretaking functions as those beyond "traditional enforcement of penal and regulatory laws." *See Anderson,* 142 Wis. 2d at 169 n.3, 417 N.W.2d at 414.

658

When we apply these definitions to what the deputy did here, we reject the State's assertion that he was acting as a community caretaker. The deputy first approached the residence to investigate a noise complaint and thus was initially acting in that capacity. *See Bies v. State*, 76 Wis. 2d 457, 471, 251 N.W.2d 461, 468 (1977) ("Checking noise complaints bears little in common with investigation of crime."). But his role as a community caretaker ended when he determined that Matthew was intoxicated and took him into custody pursuant to the Juvenile Justice Code. *See* § 938.19(1)(d)8, STATS. At this point, the deputy returned to his traditional role; he was enforcing this state's beverage control laws. *See* § 125.07(4)(b), STATS. (prohibiting alcohol possession and consumption by minors).

We recognize that the trial court found as a matter of fact that the deputy's decision to enter the house was intended solely to find Gregory so that Gregory could take custody of Matthew, not because he suspected that criminal activity was taking place inside the house.[1] Nonetheless, this finding is superfluous

---

[1] We observe that Gregory argued during the suppression hearing that the deputy's stated intention of finding someone to look after Matthew was a subterfuge, and that the deputy did indeed suspect that Gregory was involved in criminal activity. We further observe that the deputy admitted that he knew Gregory from past contacts and that he had previously visited the residence to check for runaway juveniles. While the trial court concluded that on this occasion the deputy was only interested in Matthew's well being, we reveal above that this factual finding is irrelevant to the question of whether the deputy was functioning as a community caretaker when he decided to enter the house. Because he had already taken custody of Matthew, the deputy was no longer acting as a community caretaker.

because the deputy had already stepped out of the caretaking function when he took custody of Matthew under § 938.19(1), STATS. Indeed, we find it difficult to imagine an instance where a law enforcement officer who takes action pursuant to a specific statute could be described as being divorced from his or her traditional law enforcement duties. *See Anderson*, 142 Wis. 2d at 166, 417 N.W.2d at 413.

Although we conclude that the State's community caretaker claim fails to clear the first phase of the *Anderson* inquiry—the deputy was not engaged in a "bona fide community caretaker activity"—we will nonetheless briefly discuss whether the deputy's conduct was reasonable. Specifically, we have concerns with the State's claim that the deputy's entry into the residence during his alleged exercise of the community caretaking function was "as limited as is reasonably possible." *See id.* at 169, 417 N.W.2d at 414.

We must keep in mind that the deputy made a warrantless entry into a house in the early hours of the morning without exigent circumstances present. While we are hesitant to second guess the on-the-scene judgments of a law enforcement officer, the record leaves us too uncertain about why the deputy so quickly concluded that he had to enter this house. Once the deputy placed Matthew in custody under § 938.19(1)(d)8, STATS., the deputy was required (the statute uses the term "shall") to "make every effort to release the juvenile immediately to the juvenile's parent, guardian, or legal custodian." *See* § 938.20(2), STATS. Matthew told the deputy that his father was in the Huber facility and that his mother was not home, but the record does not show that the deputy ever even tried to contact his mother. And even assuming that the deputy had good reason to decide that contacting

660

Matthew's mother was not feasible, we do not know why the deputy did not first try ringing the doorbell to awake Gregory or tell the dispatcher to phone the residence and tell Gregory that the police were outside. In sum, even if we concluded that the deputy was performing a legitimate caretaking function that evening, the record does not show that he performed that function in a reasonable manner.

We now turn to the second reason that the State offers to justify the deputy's conduct, one which was not presented to the trial court. It contends that the deputy was simply monitoring the conduct of a person in custody pursuant to *Washington v. Chrisman*, 455 U.S. 1 (1982).[2] In *Chrisman*, the Supreme Court held that a law enforcement officer may "monitor the movements of an arrested person" without invading that person's privacy rights. *See id.* at 7.

The facts of *Chrisman* are very similar to this case and warrant our detailed attention. There, the law enforcement officer likewise stopped (and arrested) an individual, a college student, for suspected underage drinking. The student did not have any identification and asked the officer if the officer would wait while he retrieved it from his dorm room. The officer responded that he would have to accompany the student, who agreed. *See id.* at 3.

When they arrived at the room, the door was open and thus the officer waited in the doorway while the student went inside to find his ID. As the officer stood there waiting, he observed that the student's roommate became nervous. The officer then saw what

---

[2] Although other Wisconsin cases have cited *Washington v. Chrisman*, 455 U.S. 1 (1982), the State reports that none of these cases have applied its reasoning. The State sought publication of this decision on that ground.

he thought were marijuana seeds and drug paraphernalia on a desktop. The officer therefore entered the room and confirmed his suspicion about these items. His discovery led to charges against the roommate for marijuana possession. *See id.* at 3–4.

The Washington Supreme Court, however, suppressed the drug-related evidence after determining that the officer's entry into the room was unreasonable. The court recognized that a law enforcement officer must be able to closely monitor an arrested person because of the possibility of escape and concerns of officer safety, but the court reasoned that those goals could have been maintained had the officer just stayed in the doorway. *See id.* at 5.

The United States Supreme Court did not draw the line that far away from an arrested person. In *Chrisman,* the Court held that a law enforcement officer has a "right" to remain at an arrested person's "elbow at all times." *See id.* at 6. The Court reasoned that concerns of officer safety and flight of the arrested person required such close proximity regardless of the nature of the underlying offense or that the possibility of escape seemed remote. *See id.* at 6–7. The Court accordingly upheld the specific officer's entry into the dorm room because he did not initially have to wait at the door as he did. *See id.* at 6.

Nonetheless, we hold that *Chrisman* does not justify what the deputy did in this case. Setting aside our concerns that the "arrest" which *Chrisman* describes is not the same as the "custody" that Matthew was placed into pursuant to the Juvenile Justice Code, the explanation that the deputy was just exercising his right to monitor Matthew as Matthew looked for his brother does not justify the deputy's

separate decision to open Gregory's bedroom door. *See id.*

The trial court found that the deputy opened the door and initiated entry into Gregory's bedroom. So while the deputy may have properly monitored Matthew as Matthew proceeded into the house, down the stairs and to Gregory's closed bedroom door, that is as far as *Chrisman* took the deputy. Once the deputy opened the door and initiated entry into Gregory's bedroom, he stopped exercising his right to monitor Matthew, who was still waiting outside the door. When the deputy stopped monitoring Matthew, he was no longer insulated from Fourth Amendment scrutiny. We therefore conclude that *Chrisman* does not justify the deputy's ultimate intrusion into Gregory's bedroom.

Lastly, and regardless of our determination regarding the unreasonableness of the deputy's decision to enter the house and eventually Gregory's bedroom, the State argues that we should not suppress the statements of the juvenile girl whom the deputy found in bed with Gregory. The State contends that "[t]he link between the entry and [her] testimony is . . . not close enough to justify application of the exclusionary rule to her trial testimony."

Since the trial court failed to suppress the evidence gathered by the deputy, the court never addressed how far the scope of a suppression order should carry. Indeed, Gregory complains that "[h]er evidence has not been offered."

We agree that the record is inadequate and must be further developed. Therefore, we remand this case and direct the trial court to hold an evidentiary hearing on this issue and reach a determination about the scope of the suppression order.

In conclusion, we hold that the trial court erred when it failed to suppress the evidence arising out of the deputy's unjustified entry into Gregory's bedroom. We therefore reverse its evidentiary ruling and the judgment of conviction. On remand, we direct the trial court to issue an order suppressing the deputy's testimony about what he observed in Gregory's bedroom. Further, we direct the trial court to determine whether this order should extend to the testimony from the juvenile girl whom the deputy found in that bedroom.

*By the Court.*—Judgment reversed and cause remanded with directions.