STATE of Wisconsin, Plaintiff-Respondent,

v.

George Toland ZIEDONIS, Defendant-Appellant.†

Court of Appeals

*No. 2004AP2888–CR. Submitted on briefs August 30, 2005.
—Decided October 4, 2005.*

**2005 WI App 249**

(Also reported in 707 N.W.2d 565.)

† Petition to review denied 1-20-06.

832

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Ellen Henak*, assistant state public defender, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *William C. Wolford*, assistant attorney general.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. CURLEY, J. George T. Ziedonis appeals from the judgment of conviction entered after he pled guilty to one count of possession of a firearm by a felon, contrary to Wis. Stat. § 941.29(2),[1] and one count of

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

manufacture of a controlled substance, tetrahydrocannabinols (marijuana), contrary to Wis. Stat. §§ 961.14(4)(t) and 961.41(1)(h)2. Ziedonis contends that in denying his motion to suppress evidence that police discovered after a warrantless entry into his home, the trial court incorrectly concluded that the officers' warrantless entry was lawful under the community caretaker exception. Because we conclude that the entry was proper under the community caretaker exception, we affirm.

## I. Background.

¶ 2. On December 23, 2003, at approximately 2:00 a.m., Officers Brian Matte and Hector Sosa of the Milwaukee Police Department were dispatched to 2621 South 6th Street in the City of Milwaukee to back up another squad on a loose animal complaint. When the officers arrived at the scene, they observed two aggravated Rottweiler dogs that were running loose and chasing people around.

¶ 3. At least six officers tried, unsuccessfully, to corral the dogs using dog snares, for about an hour-and-a-half. Officer Matte testified that the dogs were "pretty vicious," and that although they did consider shooting them, they opted not to because "they appeared to be someone's pet[s]." A representative from the Milwaukee Area Domestic Animal Control Commission (Animal Control) testified that the organization handles stray and lost animals in Milwaukee County, takes calls from the Milwaukee Police Department on a daily basis, and would have been available to corral the two dogs on the night in question. When asked by the defense why the officers did not attempt to contact Animal Control, Officer Matte stated that he did not believe the service operated after midnight, and that in his four years at

835

the Milwaukee Police Department, out of more than seventy-five animal complaints to which he has responded, he has never succeeded in getting Animal Control to come to his and his colleagues' aid.

¶ 4. Officer Matte spoke with Brenda Sanders, the caller who had alerted police, who informed him that the dogs belonged to the person who lived in the back portion of the house at 2621 South 6th Street. While still trying to corral the dogs, Officer Matte and the other officers set out to find the dogs' owner. The officers believed someone was inside 2621 South 6th Street because all the lights were on, and because one of the officers had been informed that a man, believed to be the lawful occupant, was there. Having learned that someone was expected to be inside, the officers made numerous attempts to contact the occupant. These attempts included having the sirens and air horns on, and using a loud speaker to identify themselves as Milwaukee police and to request the occupant's help with the dogs. The loud speaker was so loud that it attracted the attention of neighbors, but the officers nonetheless did not receive a response from the occupant.[2] The officers were unable to knock on the door or ring the doorbell because, had they approached the house, the dogs would have attacked.

¶ 5. The back portion of 2621 South 6th Street had a back door that could be seen from the alley behind the house. The back door consisted of a see-through glass storm door and an interior door. The interior door

_____

[2] Apparently the occupant of the front portion of 2621 South 6th Street, Zdzislaw Kaminski, was asleep inside his residence and failed to hear the loud speaker or respond at the time the officers attempted to contact the resident of the back portion. It was later learned that the reason Kaminski did not wake up was because he was intoxicated and had passed out.

was open into the residence approximately four inches. Officer Matte told the court that when he saw the door ajar he thought "there was possibly something wrong with the person inside . . . ." Between an hour and an hour-and-a-half after he arrived at the scene, Officer Matte eventually made his way to the back door without the dogs noticing. He testified that at this point, before entering the house, the specific facts that the lights were on, that there was an open door, that the residence was in a high-crime area, and that there had been no response despite numerous attempts, even though it looked like someone was living there, made him "fear[] for the[] safety" of the occupant. Officer Matte then opened the unlocked storm door, entered, and closed the storm door behind him to prevent the dogs from getting in. Standing by the interior door, for over two minutes, yelling as loud as he could, Officer Matte announced himself as the police, asked anyone inside to come to the door, and asked for help with the dogs. The entire time he was knocking on the door frame with his metal baton.

¶ 6. After he still did not receive a response, Officer Matte proceeded into the residence to look for signs of a struggle. He found himself in a kitchen area and observed a handgun on the kitchen table. With his service weapon unholstered, Officer Matte proceeded through the rest of the first floor to look for someone in need of help, or a body. Continuing to announce his presence as loud as he could, he started to walk upstairs, but before making it to the second floor he noticed an assault rifle and a pile of ammunition on a couch. Upon seeing the rifle, Officer Matte returned outside, and soon reentered more heavily armed and accompanied by two other officers.

¶ 7. Announcing their presence, the officers walked up to the second floor, into what appeared to be

a living room area, and noticed drug paraphernalia in the form of glass pipes. The officers entered a bedroom and found numerous marijuana plants, as well as grow lights hanging from the ceiling and drug paraphernalia, including a scale and timers. Lastly, the officers entered another bedroom and saw a bed and what "looked like a body wrapped up in a blanket laying on the bed motionless." Announcing his presence, Officer Matte kicked the bed, hoping to get a reaction, but received none. He then pulled the blanket off the person and saw Ziedonis staring at him, conscious and fully awake. The room also contained a number of prescription drugs, as well as a marijuana pipe, all in plain view.

¶ 8. Having realized that Ziedonis was conscious, Officer Matte asked him about the dogs, and Ziedonis replied that they were downstairs. The officers stood Ziedonis up, walked him to the back of the house and asked him to help corral the dogs. He did and placed the dogs in a bathroom. Ziedonis was then arrested.

¶ 9. On December 27, 2003, Ziedonis was charged with one count of possession of a firearm by a felon, contrary to WIS. STAT. § 941.29(2),[3] and one count of manufacture of a controlled substance, tetrahydrocannabinols (marijuana), more than four but not more than twenty plants, contrary to WIS. STAT. §§ 961.14(4)(t) and 961.41(1)(h)2.[4]

---

[3] WISCONSIN STAT. § 941.29(2) provides: "A person . . . is guilty of a Class G felony if he or she possesses a firearm under any of the following circumstances: (a) The person possesses a firearm subsequent to the conviction for the felony or other crime as specified in sub. (1)(a) or (b)."

[4] WISCONSIN STAT. § 961.14(4)(t) provides: "Tetrahydrocannabinols, commonly known as "THL," in any form including tetrahydrocannabinols contained in marijuana, obtained from marijuana or chemically synthesized."

¶ 10. Later, Ziedonis filed a motion to suppress the admission into evidence of "any and all testimony concerning the guns and drugs, the discovery of the guns and drugs, and the discovery of anything within the defendant's residence[,]" on grounds that such evidence was the result of an unlawful invasion, search and seizure in violation of both the United States and the Wisconsin Constitutions. The trial court denied the motion and instead found that the officers lawfully entered the premises because their actions were in accordance with the community caretaker exception to the warrant requirement, and that all the drugs and evidence were in plain view, and thus properly subject to seizure.

¶ 11. On May 11, 2004, Ziedonis pled guilty to both counts. On the felony possession of firearm count, he was sentenced to sixty-three months' imprisonment, comprised of twenty-seven months of initial confinement, followed by thirty-six months of extended supervision. On the manufacture of controlled substance count, he was sentenced to forty-two months' imprisonment, comprised of eighteen months of initial confinement, followed by twenty-four months of extended

---

WISCONSIN. STAT. § 961.41(1) provides, in relevant part:

MANUFACTURE, DISTRIBUTION OR DELIVERY. . . . it is unlawful for any person to manufacture, distribute or deliver a controlled substance or controlled substance analog. Any person who violates this subsection is subject to the following penalties:

. . . .

(h) *Tetrahydrocannabinols.* If the person violates this subsection with respect to tetrahydrocannabinols, included under s. 961.14 (4)(t), or a controlled substance analog of tetrahydrocannabinols, and the amount manufactured, distributed or delivered is:

. . . .

supervision. The court ordered the two sentences to be served concurrently.[5] This appeal follows.

## II. ANALYSIS.

¶ 12. In reviewing the denial of a motion to suppress, this court will uphold the trial court's findings of fact unless they are clearly erroneous. *See State v. Richardson*, 156 Wis. 2d 128, 137, 456 N.W.2d 830 (1990). The application of constitutional principles to the facts is a question of law, and we decide it *de novo* without deference to the trial court's decision. *See State v. Guzman*, 166 Wis. 2d 577, 586, 480 N.W.2d 446 (1992).

¶ 13. The Fourth Amendment of the United States Constitution and article I, section 11 of the Wisconsin Constitution both protect against unreasonable searches and seizures. *See* U.S. CONST. amend. IV;[6]

---

2. More than 200 grams but not more than 1,000 grams, or more than 4 plants containing tetrahydrocannabinols but not more than 20 plants containing tetrahydrocannabinols, the person is guilty of a Class H felony.

[5] In addition to imprisonment, on the felony possession of firearm count the court also imposed a $250 fine, plus costs and surcharges, and required Ziedonis to submit a DNA sample, and on the manufacture of a controlled substance count, the court imposed costs and surcharges and required that Ziedonis's driver's license be suspended for six months. As conditions for the extended supervision, the court also ordered Ziedonis to undergo an alcohol and drug assessment, to comply with any recommended program, to undergo random urine screens, to not possess, use or sell drugs, to have no contact with the drug community, to maintain full-time employment, and to pay the costs of supervision.

[6] The Fourth Amendment of the United States Constitution provides:

Wɪs. Cᴏɴsᴛ. art. I, § 11.[7] However, even though "warrantless searches are per se unreasonable under the fourth amendment," they are "subject to a few carefully delineated exceptions" that are " 'jealously and carefully drawn.' " *State v. Boggess*, 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983) (citation omitted).

¶ 14. One such exception is the community caretaker function, which arises when the actions of the police are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *State v. Anderson*, 142 Wis. 2d 162, 166, 417 N.W.2d 411 (Ct. App. 1987), *rev'd on other grounds,* 155 Wis. 2d 77, 454 N.W.2d 763 (1990) (quoting *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973)). To determine whether a particular activity qualifies under the community caretaker exception, the following three-step test must be used: (1) whether a search or seizure, within the meaning of the Fourth Amendment, has taken place; (2) if the Fourth Amendment is implicated, whether "the police conduct was bona fide community caretaker activity;" and (3) if the conduct was bona fide community caretaker activity,

---

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[7] Article I, section 11 of the Wisconsin Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

"whether the public need and interest outweigh the intrusion upon the privacy of the individual." *Id.* at 169. In evaluating the third factor, the following four considerations should be taken into account: "(1) the degree of public interest and exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished." *Id.* at 169–70 (footnotes omitted).

¶ 15. The State bears the burden of proving that the community caretaker exception applies. *See Boggess*, 115 Wis. 2d at 449. This court has cautioned against taking a too-narrow view in determining whether the community caretaker function is present:

> An officer "less willing" to discharge community caretaking functions implicates seriously undesirable consequences for society at large: In that event, we might reasonably anticipate "the assistance role of law enforcement . . . in this society will go downhill . . . . The police cannot obtain a warrant for . . . entry. [W]ithout a warrant, the police are powerless. In the future police will tell such concerned citizens, 'Sorry. We can't help you. We need a warrant and can't get one.' "

*State v. Horngren*, 2000 WI App 177, ¶ 18, 238 Wis. 2d 347, 617 N.W.2d 508, (quoting *People v. Ray*, 981 P.2d 928, 939 (Cal. 1999)) (alterations and omissions in original).

¶ 16. The parties do not dispute the trial court's finding that a seizure, within the meaning of the Fourth Amendment, occurred, thus satisfying the first factor. *See Anderson*, 142 Wis. 2d at 169. On appeal, Ziedonis

does not appear to challenge the officers' actions once inside the residence, particularly after Officer Matte observed the handgun, or that the evidence was in plain view; rather, he asserts that the entry was unlawful.[8] We therefore limit our analysis to addressing only the propriety of the initial entry.

¶ 17. The parties also do not dispute the trial court's finding that the police were engaged in a bona fide community caretaker activity when Officer Matte approached the house because "it was for the purpose, first of all, to determine whether there was something wrong with someone in the house,"[9] thus satisfying the second factor. *See id.* at 169. Our inquiry therefore proceeds to the third step of the *Anderson* test: whether the public need and interest outweigh the intrusion upon Ziedonis's privacy, which requires a balancing of the four considerations outlined in *Anderson. See id.* at 169–70.

¶ 18. Case law provides guidance in the application of the balancing test. *State v. Paterson*, 220 Wis. 2d 526, 583 N.W.2d 190 (Ct. App. 1998), involved a war-

---

[8] At the hearing on the motion to suppress, when asked by the district attorney whether the defense was challenging only the entry or the entire search, Ziedonis's counsel replied that the defense was challenging the entire search. On appeal, Ziedonis does not explicitly concede that he is no longer challenging the entire search, but his arguments all pertain only to the purported unlawfulness of the entry. In its response, the State made note of the fact that Ziedonis appeared to be challenging only the entry; Ziedonis did not dispute this statement in his reply.

[9] The parties also do not dispute the trial court's finding that the police was engaged in a bona fide community caretaker function when it responded to the complaint about loose dogs. This finding, however, is not relevant for purposes of this appeal and we therefore decline to address it further.

rantless entry into a home that did not fall under the community caretaker exception. The case arose after a neighbor reported a possible burglary after observing some suspicious activity, including someone moving from room to room, lights being turned on and off, an open garage door, and an unanswered phone call. *Id.* at 529–30. The incident occurred at 5:25 p.m., which the court noted was an unusual time for a residential burglary. *Id.* at 535. Shortly after arriving at the scene, after an unsuccessful attempt to call the house, and without first trying to get a response by knocking, the officers opened a closed, yet unlocked, door. *Id.* at 530. The officers entered the residence, announced their presence, and then systematically checked each room, which led to them find marijuana plants in one them. *Id.* A young girl, who later appeared, was present during the entry. *Id.* The court found that these facts were insufficient to "reasonably suggest[] criminal activity or the need for police intrusion into the residence to protect the property." *Id.* at 535.

¶ 19. The community caretaker exception, likewise, was held not to apply in *State v. Dull*, 211 Wis. 2d 652, 565 N.W.2d 575 (Ct. App. 1997). The case involved an early morning noise complaint where police encountered, and took into custody, an intoxicated teenager. *Id.* at 655. When police asked whether an adult who could care for him was present and the teenager offered to retrieve his older brother, the police did not allow the teenager to do so alone. *Id.* at 655–56. The teenager reluctantly let the officer in and led the officer to his brother's bedroom door. *Id.* at 656. The door was closed and loud music was playing. *Id.* After knocking a few times and receiving no response, the officer entered the bedroom and found the older brother in bed, naked, with a juvenile girl. *Id.* The court concluded that once

844

inside the residence the officer was no longer acting as a community caretaker, because by then the teenager was already in custody, but went on to state that even if he had been, the entry was not reasonable because he never attempted to contact the brother from the outside, by, for instance, ringing the doorbell. *Id.* 660–61.

¶ 20. In *State v. Ferguson*, 2001 WI App 102, 244 Wis. 2d 17, 629 N.W.2d 788, by contrast, the community caretaker exception did apply. The case involved a 911 call about a fight at an apartment building at about 10:15 p.m. *Id.*, ¶ 2. Upon arrival, the officers were let in by an intoxicated juvenile, and upon entering they found another juvenile who was highly intoxicated, ill and vomiting. *Id.*, ¶¶ 3–4. One bedroom was locked from the inside, and the officers became concerned that there could be more equally intoxicated juveniles in that room. *Id.*, ¶ 5. After yelling and knocking on the door for about thirty minutes, the officers jimmied open the door, entered the room and found marijuana plants. *Id.*

¶ 21. In concluding that the reasons for entry outweighed Ferguson's privacy rights, the court rejected Ferguson's argument that *Dull* was on point and instead distinguished the case:

> [T]he police actions and circumstances here differ in several respects from those found in *Dull*. Unlike the facts in *Dull*, where the police entered the house almost immediately after discovering an underage drinker in the driveway of his house and found Dull engaged in a sex act with a minor, here the police utilized alternative methods of confirming whether anyone was in the room before entering. They took the trouble to call Ferguson's employer to locate him, and then they yelled and knocked for approximately thirty minutes. In *Dull*,

845

the police made no attempts at contacting the underage drinker's mother, nor did they attempt to phone the house. . . .

However, the biggest distinction between the cases lies with the fact that the police in *Dull* were not faced with an emergency such as occurred here. Unlike the facts in *Dull,* the police here never stepped out of their caretaking role. Although consuming alcoholic beverages by a minor occurred in both cases, the police in this case did not know the number of people present in the apartment or their physical condition. Thus, the situation here was fluid where the situation in *Dull* was concluded with the detention of the juvenile. . . .

*Id.,* ¶¶ 21–22. In denying Ziedonis's motion to suppress, the trial court also considered the above cases and concluded that "the facts in this case are more aligned with the *Ferguson* case, rather than *Patterson* [sic] or *Dull.*"

¶ 22. We begin by addressing the first two factors of the *Anderson* test: the degree of public interest and exigency of the situation; and the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed. We discuss these two factors together, because under the facts of this case they are interrelated.

¶ 23. Ziedonis argues that the degree of public interest and exigency, and the attendant circumstances, do not weigh in favor of justifying the officers' entry under the community caretaker exception, because the officers did not have sufficient reason for concern about him to justify entry. Citing *Dull,* he argues:

Dogs have been known to escape from their houses while their owners were sleeping or were away. Many people are heavy enough sleepers not to hear dogs escape. The failure to wake up, even for sirens and

loudspeakers, does not in itself suggest anything is wrong. The mere presence of the dogs outside did not in itself suggest that something was wrong at the Ziedonis home. The open door, rather than suggesting a problem inside, instead suggests that, during the night, the dogs somehow worked the door open or the door simply was not secured as well as it should have been.

At the time Officer Matte entered the home, all he knew was that it was late at night when people could be sleeping, that the dogs were out, that some neighbor or relative believed that Mr. Ziedonis was at home, that inside lights were on, and that Mr. Ziedonis had not responded to the noise of sirens or loudspeakers.

In his reply, addressing the fact that the area was considered high-crime, he adds that in a "high-crime neighborhood, sirens [are] not unusual. People accustomed to sirens are likely to sleep through sirens."[10]

¶ 24. Ziedonis also adamantly contends that this case is analogous to, and should be controlled by, *Paterson*. Specifically, he asserts that the facts in both cases are similar in that: the police entered a home out of a concern for the occupants; it was dark outside; lights were on inside; there were no signs of forced entry; the police announced their arrival but received

---

[10] Ziedonis also argues that that the officers did not have sufficient reason to enter the home for help with the dogs, and notes that even if the dogs did give the officers a reason to enter the residence, "the public interest and exigency of the situation was insufficient to justify the entry," because "[a]lthough the dogs were loose they had not hurt anyone . . . ." Because the trial court specifically found, and the parties do not dispute, that the reason for the entry was not to attain help with the dogs, but rather a concern for the occupant, whether the dog problem was in fact an added reason for the entry is not relevant for this appeal, and we thus decline to address it.

847

no response; and there actually was someone in the house. *See Paterson*, 220 Wis. 2d at 529–30. On this basis, Ziedonis argues that the instant case is different from *Ferguson*, and maintains that the trial court's reliance on *Ferguson* was mistaken. In particular, he claims that *Ferguson* is inapplicable because it differs from his facts because in *Ferguson*: the police were initially let into the apartment; there was underage drinking; someone who had recently spoken with the occupant told police that someone was inside; and the officers did not have their guns out or use their batons. *See* 244 Wis. 2d 17, ¶¶ 2–5.

¶ 25. The State, by contrast, counters that "[a] concern about the safety and well-being of an individual is certainly a matter of significant public interest and efforts to address such concern is one of great exigency," and that "[a]t every step of the way, the police tried to avoid entering the house while still addressing the concerns that they had [and] acted reasonably under the attendant circumstances." In response to Ziedonis's contention that *Paterson* should control this case, the State asserts that *Paterson* is distinguishable because unlike this case, in *Paterson*: the police responded to a call about a possible burglary at an unusual time; the incident occurred in an area not known as high-crime; the garage door, not the door to the residence, was open; the officers appeared to have made a quick decision to enter the residence, instead of first trying to attract the attention of the occupant; and the police seemed mostly concerned about protecting the property of the residents from burglars and appeared to have assumed that the residents were not present. *See* 220 Wis. 2d at 529–30.

¶ 26. We disagree with Ziedonis and decline to conclude that the situation here is analogous to *Pater-*

*son* or *Dull*, and instead agree with the trial court that it is more akin to *Ferguson*.

¶ 27. Like in *Ferguson*, the police "utilized alternative methods of confirming whether anyone was in the [residence] before entering." 244 Wis. 2d 17, ¶ 21. In fact, it appears as though the officers did everything they could to avoid entering the house. While simultaneously making efforts to corral two vicious dogs, the officers made numerous attempts to contact who they believed to be the owner of the dogs and who they had been told was present in the residence. The officers' efforts to get the attention of the occupant from outside, before anyone approached the house, included the use of sirens and air horns, and identifying themselves over the loud speaker as Milwaukee police – efforts so loud that they attracted the attention of neighbors. While at the door and upon entering the residence Office Matte continued to try to get the attention of the occupant by yelling as loud as he could and by knocking on the door frame with his baton. In *Paterson*, by contrast, the only way in which police officers announced their arrival before entering was one unsuccessful phone call, and not until they were already inside did the officers actually announce their presence. *See* 220 Wis. 2d at 530. In *Dull*, the police likewise failed to first try to contact the older brother from outside the residence. *See* 211 Wis. 2d at 660–61.

¶ 28. Regarding the amount of time that passed, much like *Ferguson*, where police waited for approximately half an hour before entering, the police here too gave Ziedonis more than enough time, indeed as much as an hour-and-a-half, to appear before entering. *See* 244 Wis. 2d 17, ¶ 5. Conversely, in *Paterson*, the officers appeared to have entered after finding out that there was no answer to a phone call. *See* 220 Wis. 2d at 530.

¶ 29. Most importantly, this case is also analogous to *Ferguson* in that the officers' fear for the safety of the occupant was like the officers' concern for the intoxicated teenagers in *Ferguson*, because in both cases the officers did not know the physical condition of the person and reasonably concluded that the situation was an emergency. *See* 244 Wis. 2d 17, ¶ 22. Hence, like the officers in *Ferguson*, and unlike the officers in *Dull*, the officers here never stepped out of their community caretaker function. *See Ferguson*, 244 Wis. 2d 17, ¶ 22. Contrary to Ziedonis's contention that the officers did not have sufficient reason for concern, we believe it was reasonable for the officers to conclude that there was a serious concern for the safety of the person inside. The officers' observation that the back door to the residence was open at 2:00 a.m. clearly concerned them and made them feel as though there could be something wrong with the person inside. Not only did the officers face a situation where they had received no response from the occupant, even though 'they had reason to believe someone was present, and despite all of their attempts, the events also transpired in the early morning hours, in a high-crime area, by a residence where a door was open and the lights were on, and where the occupant's dogs were running loose in the neighborhood. The situation was hence decidedly different from *Paterson* where the incident took place in the afternoon, in an area not considered high-crime, and where the only indication that something could be wrong was a vague phone call from a neighbor. *See* 220 Wis. 2d at 529. Adding to the inapplicability of *Paterson*, as the State points out, in *Paterson* the suspicion that a burglary was in progress implied only a concern for the property inside, whereas here the concern was about the physical well-being of the occupant. *See id.* at 530.

¶ 30. Based upon the foregoing, we conclude that both the degree of public interest and exigency of the situation, and the attendant circumstances surrounding the seizure, weigh in favor of concluding that the police were acting in the community caretaker role. *See Anderson*, 142 Wis. 2d at 169.

¶ 31. Having concluded that the first two factors favor the exception, we move to the third consideration; whether an automobile is involved. *See Anderson*, 142 Wis. 2d at 169. Anderson explained that this is a consideration because "[i]n some situations a citizen has a lesser expectation of privacy in an automobile." *Id.* at 169 n.4. The trial court did not address this factor, however, we believe that under *Anderson*, we are obligated to consider it. *See id.* Hence, because this case involves a residence, the lower expectation of privacy that one might have in an automobile is not present, and the absence of an automobile therefore weighs against the community caretaker exception. *See id.*

¶ 32. Finally, the availability, feasibility and effectiveness of alternatives to the type of intrusion must be considered. *See id.* at 170. Ziedonis argues that not only did the officers have the option of calling Animal Control for assistance with corralling the two Rottweilers, but the officers also could have shot the dogs.

¶ 33. We think Officer Matte's failure to contact Animal Control was perfectly understandable as he was under the impression that the organization's services were unavailable after midnight. Particularly given his multiple disappointing experiences with the organization in the past, his reluctance to contact them cannot be faulted. It is equally easy to understand that the officers wanted to avoid shooting the dogs because they

851

believed, correctly so, that they were pets. Opting to try to contact the dogs' owner under these circumstances thus seems like an entirely reasonable course of action. Nevertheless, as previously stated, and as both parties concede, it was not the concern about the dogs which ultimately led the officers to enter the home; rather, it was their concern about the dogs' owner, the occupant of 2621 South 6th Street. We are not aware of, and Ziedonis does not suggest, any viable alternatives to the entry beyond everything the officers already tried in attempting to contact the dogs' owner. Consequently, this factor favors the community caretaker exception. *See id.*

¶ 34. In sum, we are convinced, after considering all four factors of the *Anderson* test, that the public need and interest do outweigh the intrusion upon Ziedonis's privacy, and the officers' actions were thus justified under the community caretaker exception to the warrant requirement.[11] Therefore, the trial court's denial of Ziedonis's motion to suppress was not clearly erroneous. Accordingly, we affirm.

*By the Court.*—Judgment affirmed.

---

[11] Moreover, Officer Matte's observations of the handgun on the kitchen table, and of the assault rifle on the couch on the second floor, added to the reasonableness of the officers' decision to continue to search the house for someone in need of help or a possible body.