*493 DAVID T. PROSSER, J.
¶ 85. (dissenting). The Fourth Amendment to the United States Constitution reads as follows:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
¶ 86. There are exceptions to the Fourth Amendment's warrant requirement, but these exceptions are "few in number and carefully delineated." United States v. U.S. Dist. Court, 407 U.S. 297, 318 (1972). In cases in which the police have seized evidence that a defendant seeks to suppress, a court must determine whether the police conducted a search and, if so, whether they were required to obtain a judicial warrant before the search. No warrant is required when the police are acting pursuant to a recognized exception to the warrant requirement.
¶ 87. Whether an exception to the warrant requirement exists in a particular case is often a close question. When a court consistently resolves these close questions against the necessity for a warrant, the court tends to expand the exceptions and reduce the protections of the Fourth Amendment. Because I believe the scope of the community caretaker exception is being substantially expanded in this case, without any compelling justification, I respectfully dissent.
I
¶ 88. The facts in this case are carefully set out by the majority opinion. See majority op., ¶¶ 4-20. Summarizing briefly, Kenosha police were called to *494 assist a man who was bleeding profusely. The man, Antony Matalonis (Antony), told inconsistent stories about how he was beaten before he was taken to a hospital. Advised that Antony lived with his brother nearby, the police were able to follow a trail of blood to the home of the brother, Charles Matalonis (Charles), a relatively short distance away.
¶ 89. There was blood on the door of Charles's house. After calling for backup, the police knocked on his door and were quickly admitted. There were splotches of blood throughout the first and second floors. Charles admitted he had been in a fight with his brother. He admitted he had been cleaning up blood. He permitted officers to go through the house to assure their own safety and explore the possibility of other injured persons in the house. They found no injured persons.
¶ 90. On the second floor, in plain view, a police officer did see marijuana and a variety of drug paraphernalia — pipes and other smoking utensils, a small silver grinder, and a ceramic water bong. The officer also encountered a locked door with a few droplets of blood scattered on the door. The officer smelled a strong odor of marijuana coming through the door and heard a fan running behind the door.
¶ 91. The date was January 15; the time was after 3:00 a.m. A reasonable person could infer that a fan is not normally operating at such a date and time merely for purposes of comfortable climate control.
¶ 92. In my view, the officer's observations on the second floor, followed by Charles's refusal to give consent to open the locked door, provided ample probable cause for a search warrant for the locked room to search for drugs. Conversely, the officers would have been hard pressed to make a case for a search warrant *495 to find a body in some condition behind the door. Officers had already accounted for other known occupants of the house, including a basement tenant.
II
¶ 93. If one acknowledges that there was no probable cause to search for a person — living or dead —behind the door, the government had to have an exception to the warrant requirement that did not require probable cause.
¶ 94. Consent to search is an exception to the warrant requirement, but everyone understands that threats and duress are inconsistent with voluntary consent. There is no claim in this case that Charles Matalonis freely consented to the search of the locked room.
¶ 95. The exigent circumstances exception also is inappropriate because the exigent circumstances exception requires probable cause.
¶ 96. Thus, the State and the majority rely upon the community caretaker exception. This exception does not require probable cause because investigation of a crime is not the predominant motivation for police action.
¶ 97. In State v. Gracia, 2013 WI 15, 345 Wis. 2d 488, 826 N.W.2d 87, I traced the history and evolution of the community caretaker exception in Wisconsin. My dissent did not discuss the court of appeals' decision in State v. Ziedonis, 2005 WI App 249, 287 Wis. 2d 831, 707 N.W.2d 565, which is a very persuasive analysis of the community caretaker exception.
¶ 98. There is no need here to restate the analysis in all past cases. It is enough to note that community caretaking has moved beyond fact situations in *496 volving automobiles to fact situations inside people's houses and even situations involving locked rooms inside people's homes. Moreover, community caretaking has moved from fact situations in which the actions of police are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," State v. Anderson, 142 Wis. 2d 162, 166, 417 N.W.2d 411 (Ct. App. 1987) (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)), rev'd on other grounds, 155 Wis. 2d 77, 454 N.W.2d 763 (1990), and, more than three decades later, fact situations in which a police officer's subjective law enforcement concerns do not negate an "objectively reasonable basis" for the officer's community caretaker function, State v. Kramer, 2009 WI 14, ¶¶ 29-32, 315 Wis. 2d 414, 759 N.W.2d 598, to situations in which a community caretaking theory supported by corroborating facts does not require a warrant even where traditional law enforcement concerns predominate.
Ill
¶ 99. As the majority properly states, majority op., ¶ 31, this court uses a three-part test when evaluating whether a law enforcement officer's performance of a community caretaker function provides an exception to the warrant requirement:
When a community caretaker function is asserted, as the basis for a home entry, the circuit court must determine: (1) whether a search or seizure within the meaning of the Fourth Amendment has occurred; (2) if so, whether the police were exercising a bona fide community caretaker function; and (3) if so, whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home.
*497 State v. Pinkard, 2010 WI 81, ¶ 29, 327 Wis. 2d 346, 785 N.W.2d 592 (citing Kramer, 315 Wis. 2d 414, ¶ 21).
¶ 100. This dissent focuses on the second and third prongs stated above.
A
¶ 101. The majority concludes that Officer Brian Ruha exercised a bona fide community caretaker function because he had an objectively reasonable basis to enter the locked room based on his observations. Majority op., ¶ 42. However, the majority opinion is unclear on what degree of certainty an officer must possess to initiate the community caretaker function and then to maintain it as circumstances change.
¶ 102. In State v. Ferguson, 2001 WI App 102, ¶ 22, 244 Wis. 2d 17, 629 N.W.2d 788, Judge Curley, joined by Judge Fine, used a felicitous phrase: "Unlike the facts in [State v.] Dull[, 211 Wis. 2d 652, 565 N.W.2d 575 (Ct. App. 1997)], the police here never stepped out of their caretaking role." (Emphasis added.) How do we determine when a police officer steps out of his "caretaking role" to focus on the investigation of criminal activity?
¶ 103. Cady v. Dombrowski and Bies v. State, 76 Wis. 2d 457, 251 N.W.2d 461 (1977), were cases in which officers were not seeking evidence of specific crimes. They were pursuing the non-criminal facet of police work and were surprised at the evidence of criminal activity that they encountered. Both cases are distinguishable from Matalonis's situation.
¶ 104. From the outset in this case, after seeing Antony, the police thought that a crime might have been committed. If a crime had been committed, there might have been other victims. However, this "theory" *498 was pursued to extreme lengths when an officer postulated that a deceased or injured person might be found behind a locked door, knowing that marijuana would almost certainly be found beyond the locked door.
¶ 105. The majority declares: "In this case,. . . the blood trail and significant amounts of blood that the officers discovered supported the officers' theory that an individual in Matalonis's residence was in need of assistance. . . . [H]ere there was sufficient evidence supporting the officers' concern that someone was in need of their assistance." Majority op., ¶ 49 n.26.
¶ 106. This expansive conception of community caretaking transforms community caretaking from a narrow exception into a powerful investigatory tool. No longer limited to the purpose of allowing the State to rely upon evidence obtained by law enforcement officers incidental to their provision of valuable services to the public, community caretaking becomes an end in itself. Officers can now easily conduct a warrantless search in the name of "community caretaking"; they must merely articulate a hypothetical community need —here, checking to see whether an injured person was trapped in the closet — based on circumstances that they observe. Conveniently, they may then retain any evidence of criminal activity that comes into their plain view as they conduct their community caretaking search.
B
¶ 107. A broad statement of a bona fide community caretaker function becomes more concerning when considered in conjunction with the public interest that the majority articulates in this case: "The *499 public has a significant interest in ensuring the safety of a home's occupants when officers cannot ascertain the occupants' physical condition and reasonably conclude that assistance is needed." Majority op., ¶ 59.
¶ 108. For this proposition, the majority cites Pinkard and Ziedonis. The Pinkard court characterized Ziedonis as involving "a significant public interest in ensuring the safety of the occupants because the officers could not ascertain their physical condition and 'reasonably concluded' that assistance was needed." Pinkard, 327 Wis. 2d 346, ¶ 45 (quoting Ziedonis, 287 Wis. 2d 831, ¶ 29). Like Pinkard, Ziedonis involved police officers entering a residence for the purpose of checking the welfare of a resident. Pinkard, 327 Wis. 2d 346, ¶ 4; Ziedonis, 287 Wis. 2d 831, ¶ 5. In both cases, officers received information indicating that a person was present in the residence, found a door ajar allowing access to the interior of the residence, announced themselves before searching the residence, and ultimately encountered the resident inside. Pinkard, 327 Wis. 2d 346, ¶¶ 2-5; Ziedonis, 287 Wis. 2d 831, ¶¶ 2-8.
¶ 109. Unlike the residents in Pinkard and Ziedonis, Matalonis responded immediately when law enforcement officers knocked on his door. Matalonis told the officers that he lived alone, and they confirmed the safety of Matalonis's tenant without accessing the locked room.[1] Consequently, with Matalonis, his *500 brother, and his tenant accounted for, Officer Ruha searched the house not for a particular person suspected of needing care but to determine whether any other person was present.
¶ 110. An open-ended search for occupants illustrates the danger that results when the majority's description of the community caretaker function combines with its statement of the public interest present in this case. As occurred here, officers could point to facts and — without demonstrating probable cause or even reasonable suspicion — use those facts to set forth a theory that a person in a building requires immediate police assistance. Given that the public would then have an interest in the officers assisting the theoretical person inside the building, officers could enter the building and search it to determine whether there is in fact a person in need of assistance. Once officers enter the building, the plain view doctrine allows them to seize evidence of unrelated criminal activity that they encounter — even if the search ultimately reveals that the person to whom they attempted to provide care remains purely theoretical. Furthermore, officers may conduct their search for the theoretical person who might need care regardless of whether other law enforcement objectives affect their desire to enter the building[2] — such as probable cause or reasonable suspicion that they will encounter evidence of unrelated *501 criminal activity inside — so long as a factual basis supports their community caretaking theory.
IV
¶ 111. The community caretaker exception recognizes the crucial role that law enforcement officers play in our society. The exception allows the State to rely on evidence that officers obtain when providing valuable services to the community. Officers frequently engage fellow citizens with no intention of investigating criminal activity, but sometimes they encounter evidence of criminal conduct during the course of those interactions. An officer engaged in a genuine community caretaking function will not and should not hesitate to assist members of the public when time is of the essence. Cf. Brigham City v. Stuart, 547 U.S. 398, 400 (2006) ("[P]olice may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.").
¶ 112. But the majority's embrace of a broad, ever-expanding version of the exception risks transforming a shield for evidence encountered incidental to community caretaking into an investigatory sword. Wisconsin already applies a generous interpretation of the exception. See 3 Wayne R. LaFave, Search and Seizure § 6.6 n.4, at 595 (5th ed. 2012) ("Because [Cady] stressed 'the distinction between motor vehicles and dwelling places,' it is commonly responded that the Cady doctrine is limited to vehicles."). Allowing law enforcement officers to conduct warrantless searches *502 based on a mere theory of community need — and without making a showing of probable cause or even reasonable suspicion — completely undermines the Fourth Amendment's warrant requirement.
¶ 113. Because I believe the majority opinion unnecessarily expands this valuable exception, I respectfully dissent.
¶ 114. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.

 The record is unclear as to the exact timing of the officers' interaction with the tenant living in Matalonis's basement. At the beginning of his testimony at the suppression hearing, Officer Ruha indicated that he did not go into the basement during his search because no blood led into the basement. Rather than enter the tenant's room, the officers "waited till he came out to talk" to them. Later in his testimony, Officer Ruha *500 indicated that he spoke with the tenant at approximately the same time he decided not to search the basement, saying, "I believe I talked to him right then and there in the basement."

 See Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); State v. Kramer, 2009 WI 14, ¶ 29, 315 Wis. 2d 414, 759 N.W.2d 598 ("The reasoning of Whren is not inconsistent with the analysis in a community *501 caretaker context, since police conduct is not based on probable cause or reasonable suspicion when a community caretaker function is ongoing.").